117 F.3d 555
 326 U.S.App.D.C. 1, 8 Communications Reg. (P&F) 339
 ILLINOIS PUBLIC TELECOMMUNICATIONS ASSOCIATION, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
Competitive Telecommunications Association, et al., Intervenors.
 Nos. 96-1394, 96-1395, 96-1407, 96-1428, 96-1429, 96-1466,
96-1476, 96-1478, 96-1479, 96-1482, 96-1484,
96-1485, 96-1486, 97-1016, 97-1021,
97-1022, 97-1039, 97-1048,
97-1069, 97-1070 and
97-1080.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 13, 1997.
Decided July 1, 1997.
 
 [326 U.S.App.D.C. 3] On Petitions for Review of Orders of the Federal Communications Commission.
 Michael K. Kellogg, Washington, DC, argued the cause and filed briefs for petitioners Bell Atlantic Corporation, BellSouth Corporation, NYNEX Corporation, Pacific Telesis Group, Southwestern Bell Telephone Company and U.S. West, Inc.
 Robert F. Aldrich, Washington, DC, argued the cause for petitioners American Public Communications Council, Georgia Public Communications Association and Illinois Public Telecommunications Association, with whom Albert H. Kramer was on the briefs.
 Robert M. Gillespie, Associate General Counsel, Richmond, VA, Virginia State Corporation Commission, argued the cause for petitioners Utility Regulatory Commissions of the Various States. With him on the briefs were Lawrence G. Malone, Solicitor, Public Service Commission of New York, Albany, NY, Jonathan D. Feinberg, Assistant Counsel, Albany, NY, Penny Baker, Patrick S. Berdge, San Francisco, CA, Peter G. Ballou, Augusta, ME, Sheldon M. Katz, Montpelier, VT, Ann E. Henkener, Columbus, OH, George M. Fleming, Houston, TX, and Terrence J. Buda, Harrisburg, PA.
 Theodore B. Olson, Washington, DC, argued the cause for petitioners Personal Communications Industry Association, Paging Network, Inc., and Pagemart II, Inc., with whom Scott Blake Harris, Washington, DC, and Robert L. Hoggarth, New York City, were on the briefs.
 David W. Carpenter, Chicago, IL, argued the cause for petitioners Interexchange Carriers, with whom Mark C. Rosenblum and Peter H. Jacoby, Basking Ridge, NJ, Genevieve Morelli, Alexandria, VA, Danny E. Adams and Steven A. Augustino, Washington, DC, Michael J. Shortley, III, Arlington, VA, Dana Frix, C. Joel Van Over, Frank W. Krogh, Richard S. Whitt, Washington, DC, Douglas F. Brent, Louisville, KY, Leon M. Kestenbaum, Jay C. Keithley and Harold R. Juhnke, Washington, DC, were on the briefs.
 John E. Ingle, Deputy Associate General Counsel, Federal Communications Commission, Washington, DC, argued the cause for respondent, with whom William E. Kennard, General Counsel, Christopher J. Wright, Deputy General Counsel, Laurence N. Bourne, Joel Marcus, Counsels, Joel I. Klein, Acting Assistant Attorney General, U.S. Department of Justice, Robert B. Nicholson and Robert J. Wiggers, Attorneys, were on the brief.
 Michael K. Kellogg, Washington, DC, argued the cause for intervenors, the Regional Bell Operating Companies and National Telephone Cooperative Association, with whom L. Marie Guillory and David Cosson were on the brief.
 Richard P. Bress, Washington, DC, argued the cause for intervenor Peoples Telephone [326 U.S.App.D.C. 4] Company. Maureen E. Mahoney was on the brief.
 Robert F. Aldrich, Washington, DC, argued the cause for intervenor American Public Communications Council, with whom Albert H. Kramer was on the brief.
 S. Walter Washington, Eva King Andries, Austin, TX, and Elizabeth A. Noel, Washington, DC, filed the joint brief for intervenors National Association of State Utility Consumer Advocates, et al.
 Charles C. Hunter, Washington, DC, and Catherine M. Hannan, Bowie, MD, filed the brief for intervenor Telecommunications Resellers Association.
 Before: EDWARDS, Chief Judge, GINSBURG and SENTELLE, Circuit Judges.
 Opinion for the Court filed PER CURIAM.
 
 PER CURIAM:
 
 1
 Before us are 20 consolidated petitions seeking review of an order of the Federal Communications Commission revamping the regulatory regime for the payphone industry pursuant to the Telecommunications Act of 1996. The petitions challenge the Commission's decisions to (1) assume authority over the rates for intrastate local coin calls; (2) set the interim rate of compensation to payphone service providers (PSPs) for access code calls and subscriber 800 calls at the market rate prevailing in the majority of states that have deregulated local coin calls; (3) tie the permanent rate of compensation for such calls to the market rate for local coin calls; (4) require only large interexchange carriers (IXCs) to pay PSPs for these calls during the first year; (5) require all IXCs both to track compensable coin calls and to compensate PSPs after the first year; (6) reclassify payphone assets transferred from the regulated to the deregulated operations of a Bell Operating Company (BOC) at net book value and those transferred from a BOC to a separate affiliate at fair market value; and (7) forbid the BOCs from discriminating between their own and their competitors' PSPs in the provision of tariffed services.
 
 
 2
 We conclude that the Commission acted arbitrarily and capriciously in selecting the interim and permanent rates of compensation for access code and subscriber 800 calls; in requiring only large IXCs to pay PSPs for these calls during the first year; in failing to provide any interim compensation to PSPs for so-called "0+" calls and calls from inmate payphones; and in prescribing fair market value for payphone assets transferred from a BOC to a separate affiliate. Therefore, we grant in part and deny in part the petitions for review.
 
 I. BACKGROUND
 
 3
 Historically only local exchange carriers (LECs) provided payphone service because its provision could not be accomplished independently from an LEC's network. In the mid-1980s the development of "smart" payphones enabled independent PSPs to begin competing against the payphone operations of the LECs. See Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996, Notice of Proposed Rulemaking (NPRM), 11 F.C.C.R. 6716 pp 4-6.
 
 
 4
 Generally speaking PSPs do not own the premises on which their payphones are located; instead, a PSP must contract with the owner of the premises, also known as the "location provider." See NPRM p 6. PSPs are compensated for calls made from their phones in two ways. First, they collect coins directly deposited into the payphones. This is the usual method of compensation for local calls. In the states (all but five) that regulate the rates for local coin calls a call costs from $0.10 to $0.35. Id. p 19 & n. 59. In the states that have deregulated local coin rates, the market rate for a coin call is $0.35 per call in four and $0.25 per call in one. Id. Second, each PSP--except those affiliated with a BOC--is compensated through a contract with an IXC (also known as an operator services provider or OSP) for the provision of operator services for collect calls and for calls billed to a calling card or to a third party. Pursuant to these contracts, the PSP agrees to "presubscribe" its payphones to the [326 U.S.App.D.C. 5] OSP for these types of calls; in other words, the OSP is the default IXC for any call made from the PSP's payphones. In exchange, the IXC agrees to pay the PSP a percentage of the revenues it earns from calls made from that PSP's payphones. Id. pp 7, 8. Calls made using the services of the presubscribed OSP are called "0+" calls because the caller simply dials "0" plus the number he is trying to reach. In addition to the above two methods of receiving compensation for calls made from payphones, the payphone operations of LECs also receive a subsidy from the carrier common line charges that the LECs assess the IXCs for originating and terminating long-distance calls. These subsidies place independent PSPs at a significant competitive disadvantage vis-a-vis the LECs' payphone operations. Id. p 8.
 
 
 5
 PSPs receive no compensation for access code calls and subscriber 800 calls. Access code calls are the calls to 800 numbers or 10XXX numbers that the caller uses to reach the long-distance carrier of his choice; all other 800 calls are known as subscriber 800 calls. PSPs used to block callers' attempts to "dial-around" the presubscribed OSP by means of an access code. With the passage of the Telephone Consumer Services Improvement Act (TOSCIA), Pub.L. No.101-435, 104 Stat. 986 (1990) (codified at 47 U.S.C. § 226), PSPs were no longer permitted to block such calls. See 47 U.S.C. § 226(c)(1)(B). Because access codes are often 800 numbers, TOSCIA effectively prevented the PSPs from blocking subscriber 800 calls as well. At the same time the Congress authorized the Commission to prescribe the compensation to be paid by the OSPs to the PSPs "for calls routed to providers of operator services" other than the presubscribed OSP. Id. § 226(e)(2). Pursuant to this provision the Commission ordered the OSPs to compensate the PSPs for access code calls but declined to prescribe compensation for subscriber 800 calls. See Policies and Rules Concerning Operator Services Access and Pay Telephone Compensation, 6 F.C.C.R. 4736 pp 34, 36 (1991), recon., 7 F.C.C.R. 4355 p 50 (1992).
 
 
 6
 It was against this background that the Congress enacted § 276 of the Telecommunications Act of 1996 "to promote competition among payphone service providers," 47 U.S.C. § 276(b)(1), by having the Commission "establish a per call compensation plan to ensure that all payphone service providers are fairly compensated for each and every completed intrastate and interstate call using their payphone." Id. § 276(b)(1)(A). In addition, the Act forbids a BOC from "subsidiz[ing] its payphone service directly or indirectly from its telephone exchange service operations or its exchange access operations" or from "prefer[ing] or discriminat[ing] in favor of its payphone service." Id. § 276(a). The Act also provides that the Commission must
 
 
 7
 (B) discontinue the intrastate and interstate carrier access charge payphone service elements and payments ... and all intrastate and interstate payphone subsidies from basic exchange and exchange access revenues ...; [and]
 
 
 8
 (C) prescribe a set of nonstructural safeguards for Bell operating company payphone service ... which safeguards shall, at a minimum, include the nonstructural safeguards equal to those adopted in the Computer Inquiry--III (CC Docket No. 90-623) proceeding.
 
 
 9
 Id. § 276(b)(1).
 
 
 10
 The Commission's first task was to determine the scope of its new mandate. The Commission decided that the Act's broad directive to promulgate regulations that would ensure that PSPs are "fairly compensated for each and every intrastate and interstate call" required the Commission to act only with respect to those types of calls for which a PSP does not already receive fair compensation. Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996 (CC Docket No. 96-128), FCC 96-388 pp 48-49 (rel. Sept. 20, 1996) (Order), recon., FCC 96-439 p 4 (rel. Nov. 8, 1996) (Reconsideration). The Commission found that such calls included local coin calls, access code calls, subscriber 800 and other toll-free calls, and 0+ calls provided by PSPs affiliated with a BOC. Order pp 52-58.
 
 
 11
 The Commission then decided that the best way of ensuring that PSPs are "fairly [326 U.S.App.D.C. 6] compensated" is to let the competitive market set the price for each call. Order p 49. Accordingly, the Commission declared that the local market for coin calls would be deregulated except where a particular State could demonstrate that competition would not constrain prices, because, for example, payphones at certain locations could be priced at monopoly rates. Id. p 51. In determining the rate at which PSPs should be compensated for access code calls, subscriber 800 calls, and other toll-free calls, the Commission rejected the cost-based approach, which attempts to approximate a PSP's actual cost for each type of call. The Commission instead adopted a "market-based" surrogate for the pricing of such calls--namely, the price for a local coin call at a particular payphone once the rates for such calls are deregulated--stating that the "cost[s] of originating the various types of payphone calls are similar." Id. p 70. The Commission emphasized, however, that the local coin rate would be only the default rate, from which the PSPs and IXCs could negotiate a departure; and the Commission expected the IXCs would have "substantial leverage" to negotiate due to their ability to block subscriber 800 calls from any particular PSP's payphones. Id. pp 70-71; Reconsideration p 71.
 
 
 12
 The Commission then had to decide who would pay the new charges for access code calls and subscriber 800 calls. The Commission concluded that rather than have the caller deposit money directly into the payphone for such calls, the IXC should be required to pay these charges, for which it could later bill the caller or the 800 subscriber, respectively. Order pp 17, 83-85. An IXC that did not want to incur charges from payphones charging excessive rates could block such calls from those phones. Id. p 17. The Commission also decided to hold the IXC responsible for tracking the number of access code calls and subscriber 800 calls it carries from each payphone in order to determine the amount of compensation it owes each PSP; the Commission found that it is technically feasible for the IXCs to track compensable calls. Id. p 96.
 
 
 13
 The Commission established a two-year interim compensation scheme whereby PSPs not affiliated with an LEC would receive compensation for access code calls and subscriber 800 calls (but not for inmate and other 0+ calls). The interim compensation scheme relies upon the modal rate ($0.35) for a local coin call in the five states that have deregulated the rate for such calls. For the first year after the effective date of the new rules, IXCs with annual toll revenues in excess of $100 million must contribute monthly to a fund to be paid out pro rata to PSPs; the amount each IXC must contribute is based upon its share of total long distance toll revenues. The total amount to be paid into the fund is determined by multiplying the average number of compensable calls made from payphones each month by $0.35, the price of a local call in the majority of deregulated states. For the second year of the interim period, all IXCs must pay the PSPs either a negotiated rate or the default per-call rate of $0.35 for each compensable call. Order pp 50-51, 72, 117-26.
 
 
 14
 In order to ensure that LECs would be unable to subsidize their payphone operations with revenues from other telephone services, the Commission decided to treat all LEC payphones as unregulated, untariffed customer premises equipment; accordingly, the LECs must transfer their payphone assets from their regulated accounts to their unregulated accounts. Order pp 142-43. As a consequence the LECs have to "reduce their interstate CCL charges by an amount equal to the interstate allocation of payphone costs currently recovered through those charges." Order p 181; Reconsideration p 170. The Commission did not, however, require the LECs to provide payphone service through structurally separate affiliates; an LEC may instead maintain its payphone assets on its own books provided that it treats those assets as unregulated. Order p 157. As explained below, the method for the valuation of the LEC's payphone assets depends upon whether the LEC transfers them to a separate corporate entity or merely segregates them for the purpose of regulatory accounting. Id. p 162.
 
 
 15
 [326 U.S.App.D.C. 7] Finally, the Commission required the BOCs to make available to all PSPs without discrimination any basic services it provides to its own payphone affiliate or division. The Commission did not prohibit the BOCs from discriminating against PSPs in the provision of untariffed services, such as the installation and maintenance of equipment, billing and collection for payphone services, and the provision of operator services. Order p 149; Reconsideration p 166.
 
 II. ANALYSIS
 
 16
 The various petitions for review now before the court challenge different aspects of the Commission's new payphone regulations. The State regulatory commissions and the National Association of the State Utility Consumer Advocates et al. (NASUCA) contend that the Commission lacks authority to regulate, or in this instance to deregulate and prevent the States from regulating, rates for local coin calls. The IXCs argue that the Commission acted arbitrarily and capriciously insofar as it (1) used the rate for local coin calls in the majority of States that have deregulated their local coin call rates as the basis for determining the interim compensation for access code and subscriber 800 calls; (2) excused IXCs with toll revenues of less than $100 million from compensating PSPs for such calls during the first year of the interim compensation period; and (3) adopted the local coin call rate that a PSP sets at each payphone as the default rate of permanent compensation for access code and subscriber 800 calls made from that phone. Members of the paging industry, Personal Communications Industry Association et al. (PCIA), contend that the Commission arbitrarily and capriciously required carriers, rather than callers, to pay PSPs for access code and subscriber 800 calls; a group of IXCs (led by Cable & Wireless, Inc.) join PCIA's challenge to the Commission's decision to require the carriers to track such calls as well. Two IXCs (Telco Communications Group, Inc. and Excel Telecommunications, Inc.) argue that the Commission did not give the parties adequate notice that it was planning to adopt a market-based interim compensation scheme. The American Public Communications Council et al. (APCC) and the Regional Bell Operating Companies (RBOCs), which are the seven holding companies that own the BOCs, challenge the Commission's choice of methodologies for valuing payphone assets transferred from regulated to unregulated status; the RBOCs also contend that the Commission arbitrarily and capriciously excluded inmate and other 0+ calls from the interim compensation plan.
 
 A. Jurisdiction over Intrastate Rates
 
 17
 The utility regulatory commissions of nine states, as petitioners, and the NASUCA, as an intervenor, argue that the Act does not give the Commission the authority to preempt the States' power to regulate local coin rates. The Supreme Court has held that "[t]he crucial question in any preemption analysis is always whether Congress intended that federal regulation supersede state law." Louisiana Public Serv. Comm'n v. FCC, 476 U.S. 355, 369, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986). In the quoted case the Court explained that in the Communications Act of 1934 the Congress set up a dual system of state and federal regulation of telephone service: under § 151 the FCC has the power to regulate "interstate and foreign commerce in wire and radio communication," but under § 152(b) we are advised that "nothing in [the Act] shall be construed to apply or give the Commission jurisdiction with respect to (1) charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service by wire or radio of any carrier." 47 U.S.C. §§ 151, 152(b). The Court read § 152(b) as "not only a substantive jurisdictional limitation on the FCC's power, but also a rule of statutory construction." 476 U.S. at 373, 106 S.Ct. at 1900. Because § 276 of the Telecommunications Act of 1996 is an amendment to the 1934 Act, it too is subject to the substantive and interpretative limitations of § 152(b). Therefore, § 276 should not be read to confer upon the FCC jurisdiction over local coin rates unless § 276 is "so unambiguous or straightforward so as to override the command of § 152(b)." Id. at 377, 106 S.Ct. at 1902.
 
 
 18
 [326 U.S.App.D.C. 8] As we have seen, the Congress in § 276 directed the Commission to establish regulations to "ensure that all payphone service providers are fairly compensated for each and every completed intrastate and interstate call." The indicated petitioners and intervenors contend thats 276(b) does not manifest the clear congressional intent necessary to preempt the States' power over local coin rates. They claim that the term "compensation" is not used interchangeably in the Act with the phrase "rates and charges," which appears in § 226(b)(1)(C) (providing that OSPs are required to disclose to their customers "a quote of its rates or charges for a call"), or with the phrase "local coin rate," a term of art with which the Congress is familiar. Their point is that if the Congress had intended to give the Commission jurisdiction over local coin rates, instead of requiring only generally that PSPs be "fairly compensated," then it would have stated specifically that it was giving the Commission the authority to set the rates for such calls.
 
 
 19
 It is undisputed that local coin calls are among the intrastate calls for which payphone operators must be "fairly compensated"; the only question is whether in § 276 the Congress gave the Commission the authority to set local coin call rates in order to achieve that goal. We conclude that it did. The States' and the NASUCA's argument to the contrary notwithstanding, the Congress has in fact used the term "compensation" elsewhere in the Act in such a way so as to encompass rates paid by callers. For example, § 226 provides that "[t]he Commission shall consider the need to prescribe compensation (other than advance payment by consumers) for owners of competitive payphones"; if the petitioners were correct, then the parenthetical exception would be mere surplusage. The Congress also has used the term "compensation" in other parts of the Act in such a way as to include payments made by customers. See 47 U.S.C. § 203(c)(1) (providing that a common carrier may not "charge, demand, collect, or receive a greater or less or different compensation"--i.e., from customers--than that set forth in its tariffs); 47 U.S.C. § 309(j)(2)(A) (providing that competitive bidding may be used to grant licenses to use the electromagnetic spectrum if the "principal use of such spectrum will involve, or is reasonably likely to involve, the licensee receiving compensation from subscribers."). Because the only compensation that a PSP receives for a local call (aside from the subsidies from CCL charges that LEC payphone providers enjoy) is in the form of coins deposited into the phone by the caller, and there is no indication that the Congress intended to exclude local coin rates from the term "compensation" in § 276, we hold that the statute unambiguously grants the Commission authority to regulate the rates for local coin calls.
 
 
 20
 The States and the NASUCA next argue that even if the Commission has jurisdiction over local coin rates, its decision to deregulate those rates was arbitrary and capricious because the Commission did not adequately take into account the possibility of "locational monopolies" with substantial market power. Here the States and the NASUCA have in mind situations in which a PSP obtains an exclusive contract for the provision of all payphones at an isolated location, such as an airport, stadium, or mall, and is thereby able to charge an inflated rate for local calls made from that location. See Order p 59.
 
 
 21
 The Commission did not ignore the possibility of problematic locational monopolies, however; rather it concluded that it would deal with them if and when specific PSPs are shown to have substantial market power. Order p 61; Reconsideration p 62. The petitioners and intervenors failed to present any evidence that there are significant locational monopolies in the states that have already deregulated their local coin rates; accordingly, it was not unreasonable for the Commission to conclude that market forces generally will keep prices at a reasonable level, thereby making locational monopolies the exception rather than the rule. If locational monopolies turn out to be a problem, however, the Commission suggested some ways in which it might deal with them: a State might be permitted to require competitive bidding for locational contracts, or to mandate that additional PSPs be allowed to provide payphones at the location; and if these remedies fail, the Commission may consider the matter [326 U.S.App.D.C. 9] further. Order p 61. Indeed, the Commission specifically reserved the right to modify its deregulation scheme, for example, by limiting the number of compensable calls from each payphone. Id.
 
 
 22
 The NASUCA argues that the Commission's authority to act under § 276 must be narrowly tailored in order to avoid unnecessarily preempting the States' power to act. In this vein it contends that the Commission did not have to preempt the States' authority to regulate local coin rates in order to promote the widespread deployment of payphone services. The FCC points out that its regulation of intrastate matters must be as narrow as possible only when the preemption arises by implication--for example, where it is impossible to regulate interstate matters without regulating intrastate matters. See Public Serv. Comm'n of Maryland v. FCC, 909 F.2d 1510, 1514-15 (D.C.Cir.1990); Public Utility Comm'n of Texas v. FCC, 886 F.2d 1325, 1331-32 (D.C.Cir.1989). In this case the Commission has never argued that it has jurisdiction over local coin call rates merely by implication. Rather, as we have seen, the Commission has been given an express mandate to preempt State regulation of local coin calls. Accordingly, the requirement that the FCC's regulation be narrowly tailored simply does not come into play.
 
 
 23
 Finally, the petitioners argue that if the Commission has the authority to regulate the rates for local coin calls, then it may not forebear from regulating them--that is, by relying upon market forces to determine prices--unless it makes the three findings required by 47 U.S.C. § 160. These are that enforcement of the Act or regulation is not necessary (1) to ensure "just and reasonable" nondiscriminatory charges, or (2) "for the protection of consumers," and that (3) forbearance is "consistent with the public interest." The Commission responds that it did not forbear from applying any regulation or any provision of the Act, as contemplated by § 160, because it did establish a compensation plan in accordance with the directive of the statute. We agree. A market-based approach is as much a compensation scheme as a rate-setting approach; hence § 160 is simply not relevant to the regulations presently under review.
 
 
 24
 B. Setting Compensation for 800 and Access Code Calls Equal to the Deregulated Local Coin Rate
 
 
 25
 The FCC decided that the compensation rate for 800 and access code calls should be equal to the deregulated local coin rate. The FCC rested this conclusion on one ground--that the costs of coin calls, 800 calls, and access code calls all are similar:
 
 
 26
 If a rate is compensatory for local coin calls, then it is an appropriate compensation amount for other calls as well, because the cost[s] of originating the various types of payphone calls are similar.
 
 
 27
 Order p 70 (emphasis added); see also id. ("[W]e conclude that deregulated local coin rates are the best available surrogates for payphone costs . ..." (emphasis added)); Reconsideration p 71 ("[T]he costs of originating the various types of payphone calls are similar."). No other justification was offered by the FCC for its conclusion.
 
 
 28
 The problem with the FCC's decision is that the record in this case is replete with evidence that the costs of local coin calls versus 800 and access code calls are not similar. Numerous IXCs pointed out that the costs of coin calls are higher than those for coinless calls because of the costs typically associated with use of coin equipment (e.g., the costs of purchasing the equipment and coin collection). See, e.g., AT&T Reply 6 (July 15, 1996); Cable & Wireless, Inc., Petition for Reconsideration 5-6 (Oct. 21, 1996); Comments of Sprint Corporation 9 (July 1, 1996); WorldCom, Inc., Petition for Reconsideration 8-9 (Oct. 21, 1996). In addition, IXCs showed that costs of local coin calls are higher because the PSP bears the costs of originating and completing local calls (i.e., the "end-to-end" costs); by contrast, for coinless calls, the PSP only bears the costs of originating the calls. See, e.g., AT&T Reply 12-13; Comments of Sprint Corporation 9. Even the APCC, a trade group for independent PSPs, acknowledged that the costs of coin calls are higher than those of coinless calls. See Comments of the American Public Communications Council 16 n.15 (July 1, [326 U.S.App.D.C. 10] 1996) ("Arguably the local coin rate should be higher than the rate for a [coinless] call because of the usage and coin collection costs typically associated with local coin calling."). AT&T estimated that the costs of local coin calls are three times higher than those of coinless calls. See AT&T Reply 8-9.
 
 
 29
 The FCC failed to respond to any of the data showing that the costs of different types of payphone calls are not similar. Rather, the FCC's Order cavalierly proclaims that the costs of local coin calls versus 800 and access code calls are "similar," without even acknowledging any of the contrary data. See Order p 70. The agency's order on Reconsideration at least recognizes that some parties had argued that the costs of coin calls are not "similar" to those of 800 and access code calls; but the FCC then dismissed the argument with two words--"We disagree"--and never provided any reasons for its "disagreement." See Reconsideration p 71. The FCC's ipse dixit conclusion, coupled with its failure to respond to contrary arguments resting on solid data, epitomizes arbitrary and capricious decisionmaking. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Automobile Ins. Co., 463 U.S. 29, 46-57, 103 S.Ct. 2856, 2868-73, 77 L.Ed.2d 443 (1983).
 
 
 30
 The FCC contends that even if the compensation rate is unsupported, it should be upheld because it is only a "default" rate. In other words, the FCC claims that IXCs will be able to "block" calls from overpriced payphones and, therefore, will be able to negotiate lower rates if the local coin rates are too high. See Reconsideration p 71. This possibility, however, does not save a default rate that is inexplicably tied to a local coin rate.
 
 
 31
 We have no good reason to doubt the FCC's conclusion that the IXCs' potential to block calls gives them some leverage to negotiate. Although the IXCs protest that they cannot currently recognize overpriced payphones in "real time," see AT&T Reply 4 n.8, they do not argue that they lack the technology to do so. In fact, at oral argument, counsel for the IXCs all but conceded that the relevant technology is currently available. See Tr. of Oral Argument at 15-19. We therefore conclude that the FCC's assumption that IXCs have the capacity to "block" calls is reasonable. See Telocator Network of Am. v. FCC, 691 F.2d 525, 539-42 (D.C.Cir.1982). However, this conclusion does not save the default compensation rate for 800 and access code calls. The critical point here is that the FCC has failed to justify tying the default rate to local coin rates; and the mere possibility that the default rate might be adjusted by negotiation does not negate the fact that it is arbitrary. Indeed, blocking is hardly an ideal option for the IXCs, for it is not only expensive to implement, see, e.g., Petition of Sprint for Reconsideration 10 n.8 (Oct. 21, 1996); Tr. of Oral Argument at 19 (counsel for the IXCs, without contradiction, stated that blocking is "immensely more expensive" then tracking), but its use invariably will result in a mutual loss of business for both the PSPs and the IXCs. Thus, at a minimum, the IXCs are entitled to a default rate that is reasonably justified, so they are not forced to resort to blocking only because the default rate has been set at an unreasonable level.
 
 
 32
 In short, the FCC's conclusion that compensation for 800 and access code calls should be set at the deregulated local coin rate is unjustified. Accordingly, we remand this issue to the agency for further consideration.
 
 C. Interim Plan
 
 33
 1. Compensation for 800 and Access Code Calls During the Interim Period
 
 
 34
 The IXCs also challenge the FCC's interim plan for compensation for 800 and access code calls based on a rate of $.35 per call. Under the first phase of the interim plan, large IXCs (with toll revenues over $100 million) are required to pay a flat-rate compensation of $45.85 per payphone per month ($.35 per call multiplied by 131, the average number of 800 and access code calls per payphone per month); the large IXCs must pay the flat-rate compensation in proportion to their total long distance revenues. During the second phase, all IXCs are required to pay $.35 per 800 or access code call. We find that the interim plan is arbitrary and capricious for two reasons.
 
 
 35
 [326 U.S.App.D.C. 11] First, the FCC cites no reasonable justification for an interim rate based on $.35 per call. The FCC picked the $.35 figure because the $.35 rate was deemed the best approximation of a deregulated coin rate, as it is "the rate in the majority of states that have allowed the market to determine the appropriate local coin rate," Order p 72. However, as we have already found, the FCC's decision to set compensation for 800 and access code calls at the deregulated local coin rate was arbitrary and capricious. Thus, the $.35 rate, which is an attempt to approximate the deregulated coin rate, cannot stand. The FCC must now set a new interim rate and decide what is to happen once the interim period is over. The agency may of course elect to use the new interim rate as a "default rate" at the conclusion of the interim period. If this were done, the PSPs and IXCs still could be left free to depart from the default rate through negotiations (with IXCs having to resort to blocking to gain leverage in any such negotiations).
 
 
 36
 Second, we also find that the FCC acted arbitrarily and capriciously in requiring payments only from large IXCs--those with over $100 million in toll revenues--for the first phase of the interim plan. The FCC based this decision on concerns of administrative convenience. See Reconsideration p 126. It is far from clear that the administrative burdens are as heavy as the FCC seems to believe them to be, as each carrier would merely be required to write a check based on its percentage of annual toll revenues. Yet, even assuming, arguendo, that the FCC's limitation marginally increases administrative convenience, this limitation comes at a huge cost. For example, if small IXCs were included, they could be required to pay as much as $4 million per month. As the small IXCs concede, this amount is "far from de minimis." Final Brief of Intervenor Telecommunications Resellers Association at 9. Administrative convenience cannot possibly justify an interim plan that exempts all but large IXCs from paying for the costs of services received. Perhaps more fundamentally, the FCC did not adequately justify why it based its interim plan on total toll revenues, as it did not establish a nexus between total toll revenues and the number of payphone-originated calls. Accordingly, we grant the petition for review on these points, and remand the matter to the FCC for further consideration.
 
 
 37
 2. Compensation for 0+ Calls During the Interim Period
 
 
 38
 Section 276 requires the Commission to "prescribe regulations that establish a per call compensation plan to ensure that all payphone service providers are fairly compensated for each and every completed intrastate and interstate call using their payphone." 47 U.S.C. § 276(b)(1)(A). The Commission's Order, however, limits compensation during the first interim year to access code and 800-calls. Order p 124-25. PSPs will therefore receive no interim compensation for so-called "0+" calls. Nowhere does the Commission explain why this is so.
 
 
 39
 The RBOCs complain that the Commission's failure to provide compensation for 0+ calls is both unreasoned and contrary to the plain language of § 276. The Commission does not dispute this claim on the merits. It argues rather that we should not consider the RBOCs' claim because they failed to raise it before the Commission. 47 U.S.C. § 405. We disagree.
 
 
 40
 The RBOCs mentioned the argument in their petition for clarification, but stated that they did not "anticipate any challenge to the Commission's failure to include, in its interim compensation levels, an estimate of the 0+ calls carried by RBOC payphones." RBOC Petition for Clarification at 5 n.1. The Commission uses this language to argue that the RBOCs affirmatively abandoned this claim in their proceedings before the Commission and cannot therefore raise it in this court. The Commission, however, focuses only on a single sentence. The next sentence reads, "[s]o long as the interim compensation mechanism provides some level of recompense ... on 0+ calls where RBOCs are not otherwise compensated, the RBOCs see no reason to upset the Commission's balance of competing concerns." Id. (emphasis in original). The RBOCs' promise to refrain from challenging this portion of the regulations was conditioned on the Commission's provision of [326 U.S.App.D.C. 12] "some level of recompense" for 0+ calls during the first interim year. The Commission's final interim plan included no such "level of recompense." The RBOCs did not, therefore, abandon this claim. Their petition for clarification gave the Commission an "opportunity to pass" upon this question. That is all thats 405 requires. We therefore reject the Commission's waiver argument. On the merits, it is clear that the RBOCs are correct. The Commission's failure to provide interim compensation for 0+ calls is patently inconsistent withs 276's command that fair compensation be provided for "each and every completed ... call." The Commission's failure to provide an explanation for this seemingly illogical decision is arbitrary and capricious. On remand, the Commission must correct this flaw in the interim compensation scheme.
 
 
 41
 3. Compensation for Inmate Calls During the Interim Period
 
 
 42
 The RBOCs raise a different but related issue regarding compensation during the interim period for calls made from inmate payphones. The Commission decided that inmate payphones would not be eligible for any interim flat-rate compensation for coinless calls. The Commission said this decision was justified "because such payphones are not capable of originating either access code or subscriber 800 calls, and the interim compensation is provided only for those two types of calls." Reconsideration p 52. The RBOCs claim that the Commission never adequately reconciled this determination with the "each and every completed call" language of § 276.
 
 
 43
 The Commission does not respond to this claim on the merits. It requests instead that we delay deciding this issue until we consider a different petition for review that also raises issues related to inmate payphones. We deny the Commission's request. There is no reason why we should defer judgment. The Commission has pointed to no way in which this issue is inextricably intertwined with the issues that we will decide in the subsequent inmate payphone case. It is entirely appropriate for us to decide this question at this time.
 
 
 44
 Doing so, we hold that the issue must be remanded to the Commission. Section 276 requires the Commission to promulgate regulations that will ensure that PSPs receive fair compensation "for each and every completed intrastate and interstate call using their payphone." 47 U.S.C. § 276(b)(1)(A). Under the regulations the Commission has promulgated, PSPs will receive no compensation for coinless calls made from inmate phones during the first interim year. This appears to be blatantly inconsistent with the language of the statute. The Commission has not explained why it is not. The Commission's interim compensation plan must therefore be remanded.
 
 D. Carrier Pays
 
 45
 The PCIA petitioners challenge as arbitrary and capricious the Commission's decision to adopt a "carrier pays" compensation system for 800 calls. In developing a payphone compensation system, the Commission's expressed desire was to create "a competitive payphone industry," Order p 8, that would be both "cost effective" and "place[ ] the payment obligation on the primary economic beneficiary," id. p 83 The Commission concluded that "carrier pays" compensation furthers each of these goals. Petitioners disagree.
 
 
 46
 Petitioners first argue that a "carrier pays" system does not--indeed, cannot--promote competition. This is so, petitioners explain, because the party causing the cost (the caller) does not have to pay it, and the party incurring the cost (the carrier, or, if the cost is passed on, the 800 service subscriber) has no way to decline it. The Commission, however, concluded that the party incurring the cost could avoid it. As the Commission explained, carriers have some leverage "to negotiate for lower per-call compensation amounts" in that they can block calls from particular payphones charging excessive rates. Reconsideration p 66, p 71. Subscribers to an 800 service can utilize a carrier's call-blocking capability by negotiating with the carrier to block calls from payphones with excessive per-call compensation charges. Order p 17. Further, as discussed above, we have determined that the Commission reasonably [326 U.S.App.D.C. 13] concluded that carriers can and will develop blocking technology. Thus, a "buyer" (the carrier or the 800 service subscriber) will have the option of rejecting a "seller's" (the PSP) excessively priced service. Given this explanation, the Commission's conclusion that a "carrier pays" compensation system will result in competitive market pricing of 800 service payphone per-call compensation charges was not arbitrary or capricious.
 
 
 47
 Petitioners also argue that the substantial burdens of the "caller pays" system outweigh the minor inconvenience to callers of requiring coin deposits. The Commission did not disagree that the burden of requiring coin deposits was slight. See Order p 85. Nevertheless, the Commission elected to adopt a "carrier pays" system in order to maintain the convenience of coinless calling upon which the public has come to rely. Id. The Commission's balancing of the competing concerns of administrative efficiency and consumer convenience was not arbitrary.
 
 
 48
 Finally, petitioners contend that the Commission's "primary economic beneficiary" analysis is flawed. The Commission concluded that the carrier is the "primary economic beneficiary" of an 800 call because the call utilizes a particular carrier regardless of where the call is originated. Reconsideration p 88. In addition, the Commission concluded that the called party received "greater economic benefit" from an 800 service call than the calling party as evidenced by the fact that the called party is willing to pay for the call. See id. As a result, the Commission concluded that it was appropriate for carriers to bear the per-call compensation charges for the calls, and that "the IXC can best pass on ... any charges for compensable calls" to the 800 service subscribers. Id. Petitioners argue that this analysis is arbitrary in that a carrier benefits from an 800 service call regardless of whether that call is made from a payphone or a home phone. It is the caller that primarily benefits from the use of the payphone. We fail to understand petitioners' point. The Commission did not disagree with petitioners that carriers (and subscribers) benefit from 800 service calls regardless of the source of the call. See id. What the Commission concluded was that as the "primary economic beneficiaries" of 800 service calls, carriers should incur the costs of the calls which, in the case of payphone calls, now include per-call compensation charges. The Commission's judgment on this matter was neither arbitrary nor capricious. We therefore reject petitioners' challenge to the "carrier pays" compensation scheme.
 
 E. Tracking
 
 49
 We can quickly dispose of the argument, made by a subset of IXCs, that the FCC acted arbitrarily and capriciously in requiring that IXCs "track" payphone calls. In its Order, the FCC concluded that "the requisite technology exists for IXCs to track calls from payphones." Order p 96. None of the commenters disputed this claim. Instead, the complaining IXCs merely argue that the call tracking responsibility should be placed on another party. The FCC, however, acted well within the bounds of reasonableness in assigning this responsibility to the IXCs. As a result, we deny the petition for review on this claim.
 
 F. Non-discrimination
 
 50
 The APCC petitioners challenge the Commission's decision to prohibit discrimination by BOCs only in the provision of basic services. According to petitioners, the nondiscrimination mandate of § 276(a)(2) of the Communications Act requires that the Commission adopt regulations prohibiting all discrimination by BOCs, including discrimination in the provision of basic services. We, of course, review an agency's construction of a statute which it administers under the two-step test developed by the Supreme Court in Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under the first step of the Chevron test, we ask "whether Congress has directly spoken to the precise question at issue." Id. at 842, 104 S.Ct. at 2781. If so, "that is the end of the matter." Id. However, if Congress has not spoken directly to the question at issue, we then ask "whether the agency's answer is based on a permissible construction of the statute." Id. [326 U.S.App.D.C. 14] at 843, 104 S.Ct. at 2781. We apply this test to the FCC's construction of § 276.
 
 
 51
 Section 276(a)(2) of the Communications Act provides that "any Bell operating company that provides payphone service ... shall not prefer or discriminate in favor of its payphone service." 47 U.S.C. § 276(a)(2). This command, taken alone, appears to express an unambiguous congressional intent to eliminate all discrimination by BOCs in favor of their payphone services. However, under step one of Chevron, we consider not only the language of the particular statutory provision under scrutiny, but also the structure and context of the statutory scheme of which it is a part. Amalgamated Transit Union v. Skinner, 894 F.2d 1362, 1368 (D.C.Cir.1990). Considering these other indicators of congressional intent, the command of § 276(a) is far from clear.
 
 
 52
 Subsection (b) of § 276 requires the Commission to adopt "regulations that ... prescribe a set of nonstructural safeguards ... to implement the provisions of ... subsection (a), which safeguards shall, at a minimum, include the nonstructural safeguards equal to those adopted in the Computer Inquiry-III ... proceeding." Id. § 276(b)(1)(C). The safeguards adopted in the Computer Inquiry-III proceeding do not prohibit all discrimination in the provision of nontariffed services to independent PSPs. See In the Matter of Computer III Remand Proceedings: Bell Operating Company Safeguards and Tier 1 Local Exchange Company Safeguards, 6 F.C.C.R. 7571, 7575-76 (1991). Section 276(b)(1) thus implies that Congress did not view the elimination of discrimination in the provision of nontariffed services as necessary to comply with the command of § 276(a). Although petitioners point us to a House Report concerning § 276 which expresses an intent to " 'eliminate all discrimination between BOC and independent payphones,' " H.R.REP. NO. 104-204(I), at 88 (1995) (emphasis added), the language and structure of the statute enacted do not establish an unambiguous congressional intent to eliminate all discrimination in the provision of nontariffed services.
 
 
 53
 We therefore proceed to step two of the Chevron test and ask whether the Commission's resolution of the ambiguity in § 276 was "permissible." The Commission concluded that it was unnecessary to prohibit BOC discrimination in the provision of nontariffed services as those services "are available on a competitive basis and do not have to be provided by [BOCs] as the only source of services." Reconsideration p 166. This policy judgment is both reasonable and consistent with the Act's purposes of "promot[ing] competition and reduc[ing] regulation." Pub.L. No. 104-104. We therefore hold that the Commission's interpretation of § 276 as only requiring regulations eliminating discrimination in the provision of basic services was permissible.
 
 G. Payphone Asset Valuation
 
 54
 Finally, both the BOC and APCC petitioners challenge as arbitrary the Commission's method of valuing payphone assets. Section 276(a)(1) provides that "any Bell operating company that provides payphone service shall not subsidize its payphone service directly or indirectly from its telephone exchange service operations or its exchange access operations." Id. U.S.C. § 276(a)(1). Subsection (b) of § 276 requires the Commission to issue "regulations that ... discontinue ... all intrastate and interstate payphone subsidies from basic exchange and exchange access revenues." 47 U.S.C. § 276(b)(1)(B). The Commission's rules governing the accounting valuation of assets transferred between affiliates ("affiliate transaction rules") provide that:
 
 
 55
 Assets sold or transferred between a carrier and its affiliate pursuant to a tariff, including a tariff filed with a state commission, shall be recorded in the appropriate revenue accounts at the tariffed rate. Non-tariffed assets sold or transferred between a carrier and its affiliate that qualify for prevailing price valuation, as defined in paragraph (d) of this section, shall be recorded at the prevailing price. For all other assets sold by or transferred from a carrier to its affiliate, the assets shall be recorded at the higher of fair market value and net book cost.
 
 
 56
 47 C.F.R. § 32.27(b).
 
 
 57
 Interpreting these provisions, the Commission concluded that an LEC providing payphone [326 U.S.App.D.C. 15] service may, but need not transfer its payphone operations to a "structurally separate affiliate[ ]." See Order p 157. Those LECs that elect not to transfer their payphone assets to a separate affiliate may maintain the assets on the books at net book value. Id. p 163. If, on the other hand, an LEC transfers its "payphone assets to either a separate affiliate or an operating division that has no joint and common use of assets or resources with the LEC and maintains a separate set of books," the LEC must record the transfer of assets at the higher of fair market value or net book value. Id. p 164. Fair market value includes the value of "intangible assets such as location contracts." Id. According to the Commission, fair market valuation will "effectively capture[ ] on the carrier's books any appreciation in value of those assets, thus ensuring that any eventual gains would accrue to the benefit of the ratepayers and shareholders." Id. p 166. The BOC petitioners contend that the Commission acted arbitrarily in requiring fair market valuation of those payphone assets transferred to a separate affiliate or operating division. Conversely, the APCC petitioners argue that the Commission acted arbitrarily in requiring the use of net book value for payphone assets not transferred.
 
 
 58
 As a general rule, utility service ratepayers "pay for service" and thus "do not acquire any interest, legal or equitable, in the property ... of the company. Property paid for out of moneys received for service belongs to the company." Board of Pub. Util. Comm'rs v. New York Tel. Co., 271 U.S. 23, 32, 46 S.Ct. 363, 366, 70 L.Ed. 808 (1926). However, we have held that neither ratepayers nor the company (and thus its shareholders) are necessarily entitled to increases in the value of assets employed in the utility's operations. See Democratic Cent. Comm. of the Dist. of Columbia v. Washington Metro. Area Transit Comm'n, 485 F.2d 786, 805 (D.C.Cir.1973), cert. denied, 415 U.S. 935, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1974). Rather, such increases are to be allocated under a two-step test in which the court first asks which party "bears the risk of loss" on the assets. AT&T Info. Sys., Inc. v. FCC, 854 F.2d 1442, 1444 (D.C.Cir.1988). The party that bore the risk of loss is the party entitled to the capital gains on the assets. See id. Only if it is difficult to determine who bore the risk of loss will "the second principle come[ ] into play, namely, 'that those who bear the financial burden of particular utility activity should also reap the benefits resulting therefrom.' " Id. (quoting Democratic Cent., 485 F.2d at 808).
 
 
 59
 In developing its valuation methodology, the Commission declined to apply the two-step test we developed in Democratic Central. According to the Commission, that test is not "directly applicable either to the situation where a carrier retains the payphone assets on its books or transfers the payphone assets to a separate affiliate." Order p 168. Instead, the Commission concluded that its affiliate transaction rules adequately protected the interests of ratepayers. Id. Taken alone, this conclusion may be correct. But the Commission fails to recognize that our test in Democratic Central was designed to protect not only the interests of ratepayers, but also the competing interests of shareholders. See 485 F.2d at 806. By adopting a going concern valuation methodology, the Commission was attempting to transfer the increase in the value of the payphone operations from the LECs (and their shareholders) to ratepayers. This was plainly inappropriate under Democratic Central.
 
 
 60
 As explained above, in allocating increases in asset value under Democratic Central, we first ask which party bore the risk of loss on the assets. The answer to that question may change over time depending on the regulatory scheme in place. Prior to October 1990, the FCC regulated the rates of local telephone exchange companies under a rate-of-return regulatory system. See Policy and Rules Concerning Rates for Proposed Dominant Carriers, Further Notice of Proposed Rulemaking, 3 F.C.C.R. 3195 (1988). Under a rate-of-return system, a company "can charge rates no higher than necessary to obtain sufficient revenue to cover" the costs of regulated activities and "achieve a fair return on equity." See National Rural Telecom Ass'n v. FCC, 988 F.2d 174, 177-78 (D.C.Cir.1993) (internal quotations and citations omitted). The provision of payphone service traditionally has been treated as a [326 U.S.App.D.C. 16] regulated activity. See 47 C.F.R. §§ 32.2351, 32.6351, 32.5010. Thus, LEC shareholders were protected against losses from depreciation expenses on the assets of regulated activities; it was ratepayers who bore the risk of loss on such assets. See AT&T Info. Sys., 854 F.2d at 1444.
 
 
 61
 However, in October 1990, the Commission switched to a "price cap" system of regulating the larger LECs (i.e., the BOCs and GTE companies). Policy and Rules Concerning Rates for Dominant Carriers: Second Report and Order, 5 F.C.C.R. 6786 (1990). Under a price cap system, "the regulator sets a maximum price, and the firm selects rates at or below the cap." National Rural Telecom, 988 F.2d at 178. Cost reductions under the price cap scheme "do not trigger reductions in the cap," but rather increase the company's profits. See id. Thus, after 1990, the ratepayers no longer bore the risk of losses from payphone operation assets. To the extent a BOC incurred expenses in connection with payphone operations, company and shareholder profits declined. As a result, at least since 1990, investors rather than ratepayers have borne the risk of loss on payphone assets (tangible and intangible), and thus, under Democratic Central, investors should reap the benefit of increases in the value of such assets.
 
 
 62
 The Commission argues that our decision in Southwestern Bell Corp. v. FCC, 896 F.2d 1378 (D.C.Cir.1990), forecloses the BOCs' challenge to the Commission's interpretation and application of the affiliate transaction rules to this case. We disagree. In Southwestern Bell, we upheld the Commission's affiliate transaction rules against a challenge by the GTE companies. In so doing, we specifically rejected the argument that the Commission's affiliate transaction rules violated Democratic Central. Id. at 1381. We concluded that a deviation from the rule of Democratic Central was appropriate in the case of "complex, ongoing affiliate transactions" so that the Commission could guard against systematic cost misallocation by the local exchange companies. Id. at 1381-82. However, we specifically noted Democratic Central's continued applicability to "one-time" transfers mandated by industry reform. Id. at 1382. In this case, the Commission's affiliate transaction rules as applied to the transfer of payphone assets pursuant to § 276's command to discontinue payphone subsidies clearly falls within the latter category of transactions. Thus, the BOCs' challenge to the Commission's application of its rules was not foreclosed by Southwestern Bell.
 
 
 63
 The APCC petitioners argue that the Commission erred in allowing payphone assets to be placed in regulated accounts at net book value rather than fair market value. We reject the APCC petitioners' challenge to the net book valuation method for the same reasons we accept the BOCs' challenge to the Commission's fair market method. The risk of loss on payphone assets was borne by shareholders. Thus, any increases in the value of the payphone operations belongs to the shareholders, not the ratepayers. Democratic Central, 485 F.2d at 806.
 
 
 64
 We also reject the APCC petitioners' argument that § 276 requires that a BOC's payphone assets be transferred to its unregulated books. Section 276 simply requires that payphone subsidies be discontinued. 47 U.S.C. § 276(b)(1)(B). The Commission interpreted this provision as requiring only that payphone assets not transferred to a separate affiliate be accounted for under the Computer Inquiry-III nonstructural safeguards. Order p 157. These safeguards were designed to "effectively protect against cross-subsidization." 6 F.C.C.R. at 7575. We fail to see how the application of these safeguards to payphone service operations violates § 276's command to discontinue payphone subsidies.
 
 
 65
 In sum, we agree with the BOC petitioners that the Commission's fair market valuation methodology is arbitrary and capricious and contrary to our precedent. Therefore, we will vacate and remand that portion of the Commission's order for further proceedings. However, we reject the APCC petitioners' argument that the Commission's net book valuation method is arbitrary or contrary to the command of § 276.[326 U.S.App.D.C. 17] III. CONCLUSION
 
 
 66
 For the foregoing reasons, we grant in part and deny in part the petitions for review.
 
 
 67
 So ordered.