United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued February 2, 2000 Decided June 16, 2000 

 No. 99-1114

 American Public Communications Council, et al. 
 Petitioners

 v.

 Federal Communications Commission and 
 United States of America, 
 Respondents

 Telecommunications Resellers Association, et al., 
 Intervenors

 Consolidated with 
 99-1115, 99-1117, 99-1122

 On Petitions for Review of an Order of the 
 Federal Communications Commission

 Michael K. Kellogg argued the cause for petitioner Pay-
phone Service Providers. With him on the briefs were Albert 

H. Kramer and Robert F. Aldrich. David M. Janas, Michael 
J. Zpevak and Robert M. Lynch entered appearances.

 Jodie L. Kelley argued the cause for petitioners MCI 
WorldCom, Inc., et al. and supporting intervenors. With her 
on the briefs were Maria L. Woodbridge, Mark B. Ehrlich, 
Donald B. Verrilli, Jr., Leon M. Kestenbaum, Jay C. Keith-
ley, H. Richard Juhnke, Robert Digges, Jr., Mark C. Rosen-
blum, James S. Blaszak, Janine F. Goodman, Carl W. Nor-
throp, E. Ashton Johnston, Howard J. Symons, Sara F. 
Seidman, David Carpenter, Peter Keisler, Danny E. Adams, 
Steven A. Augustino, Robert J. Aamoth, Dana Frix, C. Joel 
Van Over, Teresa K. Gaugler, Michael J. Shortley, III, 
Thomas Gutierrez, J. Justin McClure, Charles C. Hunter and 
Catherine M. Hannan. John B. Morris, Jr., Michelle W. 
Cohen, James M. Smith and Genevieve Morelli entered ap-
pearances.

 Joel Marcus, Counsel, Federal Communications Commis-
sion, argued the cause for respondents. Joel I. Klein, Assis-
tant Attorney General, U.S. Department of Justice, Robert B. 
Nicholson and Robert J. Wiggers, Attorneys, Christopher J. 
Wright, General Counsel, Federal Communications Commis-
sion, John E. Ingle, Deputy Associate General Counsel, and 
Lisa A. Burns, Counsel, were on the brief.

 Albert H. Kramer argued the cause for intervenors Pay-
phone Service Providers. With him on the brief were Robert 
F. Aldrich and Michael K. Kellogg.

 H. Richard Juhnke argued the cause for Long Distance, 
Paging and Consumer intervenors. With him on the brief 
were Leon M. Kestenbaum, Jay C. Keithley, Charles C. 
Hunter, Catherine M. Hannan, Carl W. Northrop, Robert 
Digges, Jr., Howard J. Symons, Sara F. Seidman, Mark C. 
Rosenblum, David W. Carpenter, Danny E. Adams, Steven 
A. Augustino, Robert J. Aamoth, Dana Frix, C. Joel Van 
Over, Michael J. Shortley, III, Teresa K. Gaugler, Thomas 
Gutierrez and J. Justin McClure.

 Before: Edwards, Chief Judge, Sentelle and Randolph, 
Circuit Judges.

 Opinion for the Court filed by Circuit Judge Sentelle.

 Sentelle, Circuit Judge: Section 276 of the Telecommuni-
cations Act of 1996, that comprehensively amended the Com-
munications Act of 1934, see Telecommunications Act of 1996, 
Pub. L. No. 104-104, 110 Stat. 56 ("1996 Act"), concerns 
payphone services. It requires the Federal Communications 
Commission ("FCC" or "Commission") to promulgate regula-
tions to "establish a per call compensation plan to ensure that 
all payphone service providers are fairly compensated for 
each and every completed intrastate and interstate call using 
their payphone." 47 U.S.C. s 276(b)(1)(A) (Supp. III 1997). 
Petitioners representing various interests of the payphone 
industry seek review of the FCC's third attempt at a sustain-
able per-call fee plan to fulfill its s 276 obligations. We hold 
that the FCC's order withstands scrutiny under the Adminis-
trative Procedure Act. See 5 U.S.C. s 706 (1994).

 I. Background

 This case is before us for the third time. In two previous 
orders, the FCC has attempted to develop and justify a per-
call fee for coinless calls from payphones. See In re Imple-
mentation of the Pay Telephone Reclassification and Com-
pensation Provisions of the Telecommunications Act of 1996, 
11 F.C.C.R. 20541 (1996) ("First Order"); In re Implementa-
tion of the Pay Telephone Reclassification and Compensa-
tion Provisions of the Telecommunications Act of 1996, 13 
F.C.C.R. 1778 (1997) ("Second Order"). Acting on previous 
petitions for review, we have twice remanded the Commis-
sion's determinations for a lack of reasoned decisionmaking. 
See Illinois Pub. Telecomms. Ass'n v. FCC, 117 F.3d 555, 558 
(D.C. Cir. 1997) ("Payphones I"); MCI Telecomms. Corp. v. 
FCC, 143 F.3d 606, 607 (D.C. Cir. 1998) ("Payphones II"). 
Today we consider petitions challenging the FCC's third 
order on the subject. See In re Implementation of the Pay 
Telephone Reclassification and Compensation Provisions of 

the Telecommunications Act of 1996, 14 F.C.C.R. 2545 (1999) 
("Third Order").

 Historically, only local phone service providers (local ex-
change carriers or "LECs") provided payphone services. 
The development of so-called "smart" payphones in the mid-
1980s allowed independent payphone service providers 
("PSPs") to compete with the LECs. PSPs obtained their 
revenues from either coin calls or from contracts with interex-
change carriers ("IXCs" or operations services providers, 
"OSPs") for collect calls and calling card calls. See Pay-
phones I, 117 F.3d at 558-59.

 Before the 1996 Act was passed, PSPs were largely uncom-
pensated for a third type of payphone call: "dial around" 
coinless calls, where the caller uses a long distance carrier 
other than the payphone's presubscribed carrier. "Dial 
around" coinless calls include toll-free calls to long distance 
providers (such as 1-800-CALL-ATT), and the 10-10-XXX 
type of calls. See id. at 559. PSPs are prohibited from 
blocking these dial around calls. See Telephone Operator 
Consumer Services Improvement Act of 1990, Pub. L. No. 
101-435, 104 Stat. 986 (codified at 47 U.S.C. s 226 (1994)). 
In s 276 of the 1996 Act Congress addressed the problem of 
uncompensated calls by requiring the FCC to "establish a per 
call compensation plan to ensure that all payphone service 
providers are fairly compensated for each and every complet-
ed intrastate and interstate call using their payphone." 47 
U.S.C. s 276(b)(1)(A) (Supp. III 1997). The statute directs 
the Commission to prescribe regulations "[i]n order to pro-
mote competition among payphone service providers and 
promote the widespread deployment of payphone services to 
the benefit of the general public" to meet this end. Id. 
s 276(b)(1).

 The FCC decided that the best way to ensure fair competi-
tion was to allow the market to set the price for each call. 
See First Order, 11 F.C.C.R. 20541 p 70. But because no 
market has previously existed for dial around coinless calls, 
the Commission first adopted a market-based surrogate--the 
price of a local coin call at a typical deregulated payphone of 

$.35. In imposing this rate, the FCC simply said that the 
"cost[s] of originating the various types of payphone calls are 
similar." Id.

 Various parties sought review of this part of the Commis-
sion's decision, as well as several other portions of the First 
Order. See Payphones I, 117 F.3d at 563-64. We remanded 
the coinless call rate determination because the Commission 
had ignored record evidence that the costs of coin calls and 
coinless calls are not similar. See id.; see also Illinois Pub. 
Telecomms. Ass'n v. FCC, 123 F.3d 693, 694 (D.C. Cir. 1997). 
For example, numerous IXCs had noted that coin calls cost 
more than coinless calls because of the typical costs of using 
coin mechanisms in payphones. We concluded that "[t]he 
FCC's ipse dixit conclusion, coupled with its failure to re-
spond to contrary arguments resting on solid data, epitomizes 
arbitrary and capricious decisionmaking." Payphones I, 117 
F.3d at 564 (citing Motor Vehicle Mfrs. Ass'n v. State Farm 
Mut. Auto. Ins. Co., 463 U.S. 29, 46-57 (1983)).

 On remand, the FCC attempted to develop an actual mar-
ket-based rate for coinless calls. See Second Order, 13 
F.C.C.R. 1778 p 29. The Commission used the deregulated 
coin market rate as a starting point ($.35), and subtracted 
$.066 per call as representing the difference between coin and 
coinless calls, resulting in a per call rate of $.284. See id. 
p 41-42. On appeal, we again found error in the agency's 
decisionmaking. See Payphones II, 143 F.3d at 608-09. We 
faulted the Commission's failure to explain why the coinless 
market rate could be found by simply subtracting costs from 
coin call rates: "If costs and rates depend on different 
factors, as they sometimes do, then this procedure would 
resemble subtracting apples from oranges." Id. at 608. We 
noted that although the Commission "may have depended on 
the premise that the market rate for coin calls generally 
reflects the costs of those calls," it had failed to articulate its 
assumptions and connect them to its reasoning. Id. We 
remanded for further proceedings. See id. at 609.

 The Commission went back to the drawing board one more 
time. On February 9, 1999, the FCC issued its Third Order, 

which we now review. The FCC switched from the "top-
down methodology" of the Second Order to a "bottom-up" 
method, meaning that it started from zero and added up the 
costs of coinless calls to develop a coinless call rate. See 
Third Order, 14 F.C.C.R. 2545 p 13. The resulting new rate 
is $.24.

 Briefly put, the Commission first determined the "joint and 
common" costs of a payphone; that is, the monthly capital 
expense of a payphone, using the cost of a typical payphone 
and accoutrements. The FCC did not include the cost of a 
coin mechanism in this figure because it determined that that 
cost is only necessary for coin calls, but did include amounts 
as joint and common costs for monthly line charge costs, 
maintenance costs, overhead costs (known as Sales, General, 
and Administrative Costs or "SG&A"), and coding digit costs. 
Total monthly costs per payphone came to $101.29.

 To translate total monthly costs into a per call rate, the 
FCC divided that figure by the average number of calls 
received by a marginal payphone. A marginal payphone is 
one that gathers revenue to meet its costs (including an 
assumption that the payphone does not pay location rent to 
the owner of the premises because of its marginal status) but 
is not otherwise profitable. Relying on data submitted by the 
Regional Bell Operating Companies Coalition ("RBOC Coali-
tion"), the FCC came up with a figure of 439 calls per month. 
This number represents the midpoint between 414, where the 
data showed that a premises owner would not need to subsi-
dize a payphone in order to keep it, and 464, where the data 
showed that location rents would be typically required by 
premises owners. The Commission declined to rely on other 
data which used call volumes from an average payphone 
because it would cause many payphones with below-average 
call volume to become unprofitable.

 This yielded a per call figure of $.231 ($101.29 divided by 
439, rounded to the nearest one-thousandth). The FCC 
adjusted the figure upwards $.009 to cover the interest associ-
ated with having to wait for payment from IXCs, for a grand 

total of $.24. The FCC declined to add additional amounts to 
the dial around rate for bad debts and collection costs associ-
ated only with dial around calls.

 Two groups of petitioners again seek review of the FCC's 
determination, raising multiple issues. The first, represent-
ing the interests of PSPs, claims that the final rate is too low.1 
The other, representing the interests of IXCs, claims, not 
surprisingly, that the final rate is too high.2 Each interest 
group has also filed briefs intervening in the petitions of the 
other.3

 II. Analysis

 Although the petitions from the First Order were more 
wide-ranging, the area of dispute has now narrowed to the 
coinless call rate. PSPs and IXCs raise a number of objec-
tions to the Commission's order on that subject. Although 
we have given attention to each, only three are sufficiently 
weighty to warrant separate discussion in this opinion: (1) 
the FCC's failure to include a bad debt figure in the coinless 
call rate, (2) the FCC's failure to include a separate figure to 
account for collection costs associated with coinless calls, and 
(3) the decision to use data based on marginal rather than 
average payphones. In considering those three objections, 
along with those which we do not separately discuss herein, 

__________
 1 The individual petitioners are American Public Communica-
tions Counsel ("APCC"), Ameritech Corporation, Bell Atlantic Cor-
poration, Bellsouth Corporation, GTE Service Corporation, SBC 
Communications Inc., and US West, Inc.

 2 The individual petitioners are MCI Worldcom, Inc. and Sprint 
Corporation, joined by intervenors Ad Hoc Telecommunications 
Users Committee, AirTouch Communications, Inc., American 
Trucking Associations, Inc., Truckload Carriers Association, AT&T 
Corporation, Cable & Wireless USA, Inc., Competitive Telecommu-
nications Association, Excel Telecommunications, Inc., Frontier 
Corporation, Qwest Communications Corporation, Skytel Communi-
cations, Inc., and Telecommunications Resellers Association.

 3 MCI Worldcom, Inc. is not part of the IXC group intervening 
on the petitions of the PSPs.

we apply the standard of review drawn from the Administra-
tive Procedure Act and uphold the Commission's determina-
tions unless they are "arbitrary, capricious, an abuse of 
discretion, or otherwise not in accordance with law." 5 
U.S.C. s 706(2)(A) (1994); see, e.g., Achernar Broad. Co. v. 
FCC, 62 F.3d 1441, 1445 (D.C. Cir. 1995). Each of the 
decisions questioned by petitioners herein survives review 
under that standard.

 A. Bad Debt

 As we noted above, the Commission declined to add any 
amount to the coinless call fee for bad debts associated with 
the collection of coinless call fees. The PSPs, before the 
FCC, advanced arguments based on their own alleged bad 
debt experience, and now argue that the FCC should have 
been able to calculate some amount for inclusion in the 
coinless call rate based on that evidence. Cross petitioners 
argued before the Commission, and here, that the debts on 
which the proffered evidence was based were either the result 
of PSP negligence in collection, or do not genuinely represent 
bad debt losses at all, but only unresolved billing disputes. 
The Commission concluded that it had insufficient information 
about the levels of bad debt to enable it to rationally calculate 
an appropriate figure for inclusion.

 Specifically, the Commission found that the data regarding 
uncollected per-call compensation was not reliable enough to 
predict accurately future levels of bad debt. See Third 
Order, 14 F.C.C.R. 2545 p 162. The Commission noted that it 
could not determine what percentage of uncollected per-call 
compensation was the result of PSP billing errors (i.e., not 
charging the correct IXC), as opposed to deadbeat carriers 
(i.e., the appropriate party is billed but refuses to pay). The 
Commission further noted that providing an improperly com-
puted allowance for uncollectibles could result in double re-
covery if the PSP ultimately collected from the delinquent 
carrier. That is, the PSP would collect once from the IXC 
and once from the consumer (through the bad debt cost 
element included in the higher compensation amount). Final-

ly, the Commission determined that a bad debt allowance was 
unnecessary because the agency had ensured in the Third 
Order that PSPs will receive interest on late payments for as 
long as such payments are overdue. In short, with insuffi-
cient information, the Commission found "that it would be 
unwise to establish a cost element for bad debt at this time." 
Id.

 The PSP petitioners argue that the Commission was re-
quired to include some estimate of bad debt in its calculation 
and that the failure to do so "effectively determin[es] that 
dial-around uncollectibles would be zero." (The PSPs rely on 
some of the same data that the Commission deemed not 
sufficient to allow a rational decision.) We disagree.

 Perhaps the FCC could have formulated some best-guess 
figure for bad debt, but we cannot require an agency to enter 
precise predictive judgments on all questions as to which 
neither its staff nor interested commenters have been able to 
supply certainty. "Where existing methodology or research 
in a new area of regulation is deficient, the agency necessarily 
enjoys broad discretion to attempt to formulate a solution to 
the best of its ability on the basis of available information." 
Industrial Union Dep't, AFL-CIO v. Hodgson, 499 F.2d 467, 
474-75 n.18 (D.C. Cir. 1974) (citing Permian Basin Area Rate 
Cases, 390 U.S. 747, 811 (1968)); see also FCC v. National 
Citizens Comm. for Broad., 436 U.S. 775, 813-14 (1978). 
That is exactly the situation the FCC faced here. The 
agency was presented with bad debt data culled from a 
relatively short historical period, while knowing that some of 
the factors affecting that data may change in the future. Any 
figure that it might have chosen to represent bad debt would 
likely be challenged on that and other similar evidentiary 
bases. We conclude that it was prudent and reasonable for 
the Commission to decide that, on balance, the existing bad 
debt data was not reliable enough to warrant any educated 
guess as to future bad debt percentages. It may not have 
been the only decision it could have made, but it was a 
reasonable one under the circumstances.

 In upholding the reasonableness of the Commission's exclu-
sion of the bad debt element from coinless call cost, we are 
mindful of the nature of the debt involved. As intervenor 
long distance carriers remind us, the "[f]ailure to pay the 
required compensation is a violation of FCC rules for which 
the carrier is subject to damages as well as fines and penal-
ties." See 47 U.S.C. ss 206-08, 501-03 (1994). The plight of 
the allegedly uncompensated payphone service provider does 
not equate to that of a merchant pursuing deadbeat custom-
ers in the marketplace. Furthermore, for any harm that may 
be done to the PSPs, they are not left without remedy. After 
noting that it was "unable to generate a sufficient record on 
this question for issuing this Order," the FCC invited the 
parties to file petitions for clarification on the bad debt issue. 
Third Order, 14 F.C.C.R. 2545 p 162. The RBOC Coalition 
has made such a filing; the Commission has received that 
petition; sought and received comments; and, is considering 
the issue. See Common Carrier Bureau Seeks Comment on 
the RBOC/GTE/SNET Payphone Coalition Petition for Clar-
ification Regarding Carrier Responsibility for Payphone 
Compensation Payment, CC Docket No. 96-128, DA 99-730 
(1999), available at 1999 WL 335783.

 B. Collection Costs

 The Commission's calculation of the joint and common costs 
of a payphone include a figure representing "Sales, General, 
and Administrative (SG&A) costs." Third Order, 14 F.C.C.R. 
2545 p 178. SG&A includes "overhead costs, such as legal 
fees, administrative costs, salaries, and management costs." 
Id. The FCC reasoned that as the proportion of coin calls 
changes as compared to coinless calls, more employees in a 
payphone company would likely take on duties related to the 
busier type of call traffic, but that the overall overhead costs 
should remain the same. The Commission considered data 
on the subject filed with it before the issuance of the Second 
Order and data provided by the RBOC Coalition in the 
present proceeding. Based on its review of the evidence, the 
Commission determined that a reasonable estimate of SG&A 

costs on a per-phone-per-month basis was $19.62. See id. 
p 178-79.

 The Commission included this SG&A figure in calculating 
the coinless call cost but did not include in the coinless call 
rate any additional amount to account for the marginal costs 
of billing and collection of coinless fees. See id. p 163-64. 
The FCC reasoned that it had insufficient information with 
which to determine the variance of administrative costs which 
occur from a rise in coinless calls relative to coin calls. See 
id. p 164. It stated that "it [is] fair to assume that the 
amount that coin-related SG&A positions contribute to SG&A 
expenses approximate the same expense that billing and 
collection positions contribute to SG&A." Id.

 The PSPs claim that record evidence showed considerable 
actual expenses in the collection process. In their view, 
SG&A costs cannot be counted as covering these expenses 
because coinless call collection costs are properly viewed as 
an incremental expense of coinless calls, not a joint and 
common cost of payphones.

 We again disagree. It is plausible to reason, as the FCC 
did, that the percentage of SG&A overhead costs which can 
be traced to coinless call business will increase in the future if 
the market embraces coinless calls. Before the advent of dial 
around call compensation, overhead necessarily constituted 
costs attributable only to the prior forms of payphone com-
pensation. As the payphone service market shifts between 
coin calls and coinless calls, it is reasonable to expect that the 
relative portion of overhead attributable to separate underly-
ing elements of expense will change with it. This does not 
mean that either the Commission or the regulated entities 
should expect to undertake a perennial and constant adjust-
ment of cost allocation based upon that moving target. The 
use in accounting of the concept of "overhead" presupposes 
that some details of costs will be submerged in that greater 
item of calculation. If this were not the case, and if the 
PSP's argument were accepted and taken to its logical ex-
treme, we would be forced to conclude that virtually every 
dollar characterized as overhead should be treated by the 

Commission as either a cost of coin calls or coinless calls. 
But the collective concept of overhead prevents us and the 
Commission from having to determine that because a data 
input employee of a PSP spends ten percent of the time at 
her computer on coinless call matters and ninety percent on 
coin calls, the cost of her mousepad should be divided on a 
one-to-nine basis between those expense categories rather 
than classified as overhead. The FCC reasonably did not go 
down that detailed a path, and therefore did not act arbitrari-
ly, capriciously, or contrary to law in deciding that the 
collection costs of dial around compensation are fairly repre-
sented by the SG&A portion of joint and common costs.

 C. Marginal Payphone Methodology

 The FCC based its calculations on the number of calls from 
a marginal payphone--a payphone that breaks even--to en-
sure fair compensation under s 276(b)(1). The Commission 
wanted to ensure the "widespread deployment of payphones" 
as required by the statute, and declined to use average 
payphone call volume because that would render below aver-
age payphones unprofitable. Third Order, 14 F.C.C.R. 2545 
p 141.

 To determine the number of calls a marginal payphone 
receives, the FCC requested that the RBOC Coalition provide 
two figures: (1) the number of calls placed at a phone that 
does not pay rent, and (2) the number of calls made from a 
location that begins to pay rent. The two numbers reported 
back were 414 and 464, with a midpoint of 439 which the FCC 
adopted.

 The IXCs fault the FCC for relying on the RBOC Coalition 
data. They claim that the data cannot be used because the 
RBOC Coalition did not explain their underlying methodology 
for developing the data. In City of New Orleans v. SEC, 969 
F.2d 1163 (D.C. Cir. 1992), we found error in an agency's 
reliance on estimates which had "no explanation or underly-
ing support." Id. at 1167. However, that is not the case 
here. The RBOC Coalition did explain how it developed the 
data, and noted certain difficulties it had in doing so. For 

example, it pointed out that average revenue depends in part 
on factors other than call volume, such as the mix of types of 
calls and the maintenance expense of specific locations. It 
explained its attempt to determine the average daily revenue 
needed to decide to place a new payphone and the average 
revenue needed to begin paying commissions on such a 
phone, and then determined what mix of calls will produce 
that revenue. The RBOC Coalition also explained that the 
final numbers were a weighted average of numbers submitted 
by members of the Coalition. While the data submitted by 
the RBOC Coalition could be subjected to various challenges, 
we cannot say that it was unreasonable or arbitrary for the 
FCC in the exercise of its expertise to rely upon it. See 
Madison Gas and Elec. Co. v. SEC, 168 F.3d 1337, 1344 (D.C. 
Cir. 1999).

 III. Conclusion

 In summary, we conclude that petitioners have not estab-
lished that any portion of the FCC's rate calculation for 
coinless calls is arbitrary, capricious, or otherwise contrary to 
law. The errors which required us to remand on two prior 
occasions have been rectified. The petitions for review are 
therefore

 Denied.