Concurring opinion filed by Senior Circuit Judge Silberman.
Opinion filed by Circuit Judge Pillard, dissenting as to Sections II.B through II.F and concurring in part.
EDWARDS, Senior Circuit Judge:
The Communications. Act of 1934 (“1934 Act”) authorized the Federal Communications Commission (“Commission” or “FCC”) to ensure that interstate telephone rates are “just and reasonable,” 47 U.S.C. § 201(b), but left regulation of intrastate rates primarily to the states. In the Telecommunications Act of 1996 (“1996 Act”), Congress amended the 1934 Act to change the Commission’s limited regulatory authority over intrastate telecommunication *44 so as to promote competition in the payphone industry.
Before the passage of the 1996 Act, Bell Operating Companies (“BOCs”) had dominated the payphone industry to the detriment of other providers. Congress sought to remedy this situation by authorizing the Commission to adopt regulations ensuring that all payphone providers are “fairly compensated for each and every” interstate and intrastate call. 47 U.S.C. § 276(b)(1)(A). “[P]ayphone service” expressly includes “the provision of inmate telephone service in correctional institutions, and any ancillary services.” Id. § 276(d). The issues in this case focus on inmate calling services (“ICS”) and the rates and fees charged for these calls.
Following the passage of the 1996 Act, the Commission avoided intrusive regulatory measures for ICS. And prior to the Order under review in this case, the Commission had never sought to impose rate caps on intrastate calls. Rather, the FCC consistently construed its authority over intrastate payphone rates as limited to addressing the problem of under-compensation for ICS providers.
Due to a variety of market failures in the prison and jail payphone industry, however, inmates in correctional facilities, or those to whom they placed calls, incurred prohibitive per-minute charges and ancillary fees for payphone calls. In the face of this problem, the Commission decided to change its approach to the regulation of ICS providers. In 2015, in the Order under review, the Commission set permanent rate caps and ancillary fee caps for interstate ICS calls and, for the first time, imposed those caps on intrastate ICS calls. Rates for Interstate Inmate Calling Services (“Order”), 30 FCC Rcd. 12763, 12775-76, 12838-62 (Nov. 5, 2015), 80 Fed. Reg. 79136-01 (Dec. 18, 2015). The Commission also proposed to expand the reach of its ICS regulations by banning or limiting fees for billing and collection services — so-called “ancillary fees” — and by regulating video services and other advanced services in addition to traditional calling services.
Five inmate payphone providers, joined by state and local authorities, now challenge the Order’s design to expand the FCC’s regulatory authority. In particular, the Petitioners challenge the Order’s proposed caps on intrastate rates, the exclusion of “site commissions” as costs in the agency’s ratemaking methodology, the use of industry-averaged cost data in the FCC’s calculation of rate caps, the imposition of ancillary fee caps, and reporting requirements. And one ICS provider separately challenges the Commission’s failure to preempt inconsistent state rates and raises a due process challenge.
Following the presidential inauguration in January 2017, counsel for the FCC advised the court that, due to a change in the composition of the Commission, “a majority of the current Commission does not believe that the agency has the authority to cap intrastate rates under section 276 of the Act.” Counsel thus informed the court that the agency was “abandoning ... the contention ... that the Commission has the authority to cap intrastate rates” for ICS providers. Counsel also informed the court that the FCC was abandoning its contention “that the Commission lawfully considered industry-wide averages in setting the rate caps.” However, the Commission has not revoked, withdrawn, or suspended the Order. And one of the Intervenors on behalf of the Commission, the “Wright Petitioners,” continues to press the points that have been abandoned by the Commission.
For the reasons set forth below, we grant in part and deny in part the petitions for review, and remand for further pro *45 ceedings with respect to certain matters. We also dismiss two claims as moot.
• We hold that the Order’s proposed caps on intrastate rates exceed the FCC’s statutory authority under the 1996 Act. We therefore vacate this provision.
• We further hold that the use of industry-averaged cost data as proposed in the Order is arbitrary and capricious because it lacks justification in the record and is not supported by reasoned deci-sionmaking. We therefore vacate this provision.
• We additionally hold that the Order’s imposition of video visitation reporting requirements is beyond the statutory authority of the Commission. We therefore vacate this provision.
• We find that the Order’s proposed wholesale exclusion of site commission payments from the FCC’s cost calculus is devoid of reasoned decisionmaking and thus arbitrary and capricious. This provision cannot stand as presently proposed in the Order under review; we therefore vacate this provision and remand for further proceedings on the matter.
• We deny the petitions for review of the Order’s site commission reporting requirements.
• We remand the challenge to the Order’s imposition of ancillary fee caps to allow the Commission to determine whether it can segregate proposed caps on interstate calls (which are permissible) and the proposed caps on intrastate calls (which are impermissible).
• Finally, we dismiss the preemption and due process claims as moot.
I. BACKGROUND
A. Statutory Background
The 1934 Act, 47 U.S.C. § 151, et seq., established a system of regulatory authority that divides power between individual states and the FCC over inter- and intrastate telephone’ communication services. New England Pub. Commc’ns Council, Inc. v. FCC, 334 F.3d 69, 75 (D.C. Cir. 2003). Under this statutory scheme, the Commission regulates interstate telephone communication. See id.-, 47 U.S.C. § 151. This regulatory authority includes ensuring that all charges “in connection with” interstate calls are “just and reasonable.” 47 U.S.C. § 201(b). “The Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out” these provisions. Id.
The FCC, however, “is generally forbidden from entering the field of intrastate communication service, which remains the province of the states.” New England Pub., 334 F.3d at 75 (citing 47 U.S.C. § 152(b)). Section 152(b) of the 1934 Act erects a presumption against the Commission’s assertion of regulatory authority over intrastate communications. This is “not only a substantive jurisdictional limitation on the FCC’s power, but also a rule of statutory construction” in interpreting the Act’s provisions. La. Pub. Serv. Comm’n v. FCC, 476 U.S. 355, 373, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986).
The 1996 Act “fundamentally restructured the local telephone industry,” New England Pub., 334 F.3d at 71, by changing the FCC’s authority with respect to some intrastate activities and “removing] a significant area from the States’ exclusive control,” AT & T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 382 n.8, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). Nevertheless, the states still primarily “reign supreme over intrastate rates.” New England Pub., 334 F.3d at 75 (quoting City of Brookings Mun. Tel. Co. v. FCC, 822 F.2d 1153, 1155 (D.C. Cir. 1987)). “Insofar as Congress has remained silent ... § 152(b) continúes to function. The Commission could not, for *46 example, regulate any aspect of intrastate communication not governed by the 1996 Act on the theory that it had an ancillary effect on matters within the Commission’s primary jurisdiction.” AT&T Corp., 525 U.S. at 382 n.8, 119 S.Ct. 721.
Although the strictures of § 152 remain in force, the changes imposed by the 1996 Act were significant. Evidence of this is seen in the “Special Provisions Concerning Bell Operating Companies.” 47 U.S.C. §§ 271-76. Section 276 was “specifically aimed at promoting competition in the payphone service industry.” New England Pub., 334 F.3d at 71. While local phone services were once thought to be natural monopolies, “[technological advances ... made competition among multiple providers of local service seem possible, and Congress [in the 1996 Act] ended the longstanding regime of state-sanctioned monopolies.” AT & T Corp., 525 U.S. at 371, 119 S.Ct. 721; see also Glob. Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc., 550 U.S. 45, 50, 127 S.Ct. 1513, 167 L.Ed.2d 422 (2007).
The market history is illuminating. After AT & T had divested its local exchange carriers into individual BOCs in 1982, BOCs continued to discriminate against non-BOC payphone providers and effectively foreclosed competition. The BOCs accomplished this by generally making sure that other providers were not compensated for calls using BOC-owned payphone lines. See New England Pub., 334 F.3d at 71. Thus, because technology constraints forced many non-BOC providers to use BOC-owned payphone lines, those providers were often left uncompensated for payphone calls. The 1996 Act changed these market practices.
In § 276, Congress clearly aimed to “promote competition among payphone service providers and promote the widespread deployment of payphone services to the benefit of the general public.” 47 U.S.C. § 276(b)(1). Covered payphone services include “inmate telephone service in correctional institutions, and any ancillary services.” Id. § 276(d). Section 276 of the 1996 Act authorizes the Commission' “to prescribe regulations consistent with the goal of promoting competition, requiring that the Commission take five specific steps toward that goal.” New England Pub., 334 F.3d at 71. One such step is to “establish a per call compensation plan to ensure that all payphone service providers are fairly compensated for each and every completed intrastate and interstate call using their payphone,” and to prescribe regulations to establish this compensation plan by November 1996. 47 U.S.C. § 276(b)(1), (b)(1)(A). The remaining four steps further encourage or force competition between BOC and non-BOC providers. Id. § 276(b)(l)(B)-(E). Any state requirements that are inconsistent with FCC’s regulations adopted pursuant to § 276 are preempted. Id. § 276(c).
B. Factual and Procedural Background
Over the years, payphone providers have sought to provide inmate calling services to inmates in prisons and jails nationwide. ICS providers now compete with one another to win bids for long-term ICS contracts with correctional facilities. In awarding contracts to providers, correctional facilities usually give considerable weight to which provider offers the highest site commission, which is typically a portion of the provider’s revenue or profits. See Implementation of Pay Tel. Reclassification & Comp. Provisions of Telecomms. Act of 1996, 17 FCC Rcd. 3248, 3252-53 (2002). Site commissions apparently range between 20% and 63% of the providers’ profits, but can exceed that amount. Id. at 3253 n.34. .And ICS provid *47 ers pay over $460 million in site commissions annually. Order, 30 FCC Rcd. at 12821.
Once a long-term, exclusive contract bid is awarded to an ICS provider, competition ceases for the duration of the contract and subsequent contract renewals. Winning ICS providers thus operate locational monopolies with a captive consumer base of inmates and the need to pay high site commissions. See 17 FCC Rcd. at 3253. After a decade of industry consolidation, three specialized ICS firms now control 85% of the market. Order, 30 FCC Rcd. at 12801. And ICS per-minute rates and ancillary fees together are extraordinarily high, with some rates as high as $56.00 for a four-minute call. Id. at 12765 n.4.
In reviewing this market situation, the FCC found that inmate calling services are “a prime example of market failure.” Id. at 12765. In its brief to this court, FCC counsel aptly explains the seriousness of the situation:
Inmates and their families cannot choose for themselves the inmate calling provider on whose services they rely to communicate. Instead, correctional facilities each have a single provider of inmate calling services. And very often, correctional authorities award that monopoly franchise based principally on what portion of inmate calling revenues a provider will share with the facility — i.e., on the payment of “site commissions.” Accordingly, inmate calling providers compete to offer the highest site commission payments, which they recover through correspondingly higher end-user rates. See [Order, 30 FCC Rcd. at 12818-21], If inmates and their families wish to speak by telephone, they have no choice but to pay the resulting rates.
Br. for FCC at 4.
In February 2000, Intervenor Martha Wright filed a putative class action against ICS providers on behalf of her grandson, other inmates, and their loved ones to challenge ICS. rates and fees. Complaint, Wright, et al. v. Corr. Corp. of Am., No. 1:00-CV-00293 (D.D.C. Feb. 16, 2000). In 2001, the District Court stayed the case to afford the FCC the opportunity to consider the reasonableness of ICS rates in the first instance through rulemaking. Thereafter, in 2003 and in 2007, Martha Wright and others petitioned the Commission for rulemaking to regulate ICS rates and fees. Petition for Rulemaking, FCC No. 96-128 (Nov. 3, 2003); Petitioners’ Alternative Rulemaking Proposal, FCC No. 96-128 (Mar. 1, 2007).
The record compiled by the Commission fairly clearly supports its determination that ICS charges raise serious concerns. As noted in the FCC’s brief to the court:
Excessive rates for inmate calling deter communication between inmates and their families, with substantial and damaging social consequences. Inmates’ families may be forced to choose between putting food on the table or paying hundreds of dollars each month to keep in touch. See [Order, 30 FCC Rcd. at 12766-67]. When incarcerated parents lack regular contact with their children, those children — 2.7 million of them nationwide — have higher rates of truancy, depression, and poor school performance. See [id. at 12766-67 & 12767 n.18]. Barriers to communication from high inmate calling rates interfere with inmates’ ability to consult their attorneys, see [id. at 12765], impede family contact that can “make[ ] prisons and jails safer spaces,” [id. at 12767], and foster recidivism, see [id. at 12766-67].
Br. for FCC at 4-5. Petitioners do not seriously contest these facts. See Joint Br. for Pet’rs at 7 (acknowledging that “calling rates often exceed, sometimes substantially, rates for ordinary toll calls”).
*48 In 2013, the Commission issued an interim order-imposing a per-minute rate cap for interstate ICS calls, citing its plenary authority over interstate calls under § 201(b) and its mandate to ensure that providers are “fairly compensated” under § 276. Rates for Interstate Inmate Calling Services (“Interim Order”), 28 FCC Rcd. 14107, 14114-15 (2013). ICS providers petitioned for this court’s review of the Interim Order. The court stayed application of certain portions of the Interim Order but allowed its interstate rate caps to remain in effect. Order, Securus Techs. v. FCC, No. 13-1280 (“Securus I”) (D.C. Cir. Jan. 13, 2014), ECF No. 1474764 (staying only 47 C.F.R. §§ 64.6010, 64.6020, and 64.6060). In December 2014, the court held the petitions in abeyance while the Commission proceeded to set permanent rates. Order, Securus I (D.C. Cir. Dec. 16, 2014), ECF No. 1527663.
In 2015, the Commission set permanent rate caps and ancillary fee caps for interstate ICS calls, and for the first time the agency imposed caps on intrastate ICS calls. Order, 30 FCC Rcd. at 12775-76, 12838-62. The rate caps were set for four categories — “all prisons” and three tiers of jails based on size — and the rate caps varied by category. Id. at 12770. The rate caps, which were made effective immediately, ranged from $.14 to $.49 per minute, but were to decrease as of July 1, 2018, to $.11 to $.22 per minute. Id. In setting the rate caps, the Commission used a ratemak-ing methodology based on industry-average cost data that excluded site commissions as a cost. Id. at 12790, 12818-38. The Order also imposed reporting requirements on ICS providers, including for video visitation services and site commissions. Id. at 12890-93.
ICS providers Global Tel*Link; Securus Technologies, Inc.; CenturyLink Public Communications, Inc.; Telmate, LLC; and Pay Tel Communications (“Pay Tel”) (collectively “Petitioners”) separately petitioned for review. Various state and local correctional authorities, governments, and correctional facility organizations petitioned and/or intervened on behalf of Petitioners. Martha Wright’s putative, class and various inmate-related legal organizations (“Intervenors”) intervened on behalf of the Commission.
In early 2016, the court consolidated the petitions for review. On March 7, 2016, the court stayed the application of the Order’s rate caps and ancillary fee caps as to single-call services while this case was pending. Order, Global Tel*Link, et al. v. FCC, No. 15-1461 (“Global Tel-Link”) (D.C. Cir. Mar. 7, 2016), ECF No. 1602581. Subsequently, on March 23, 2016, the court stayed the application of the Interim Order to intrastate rates. Order, Global Tel*Link (D.C. Cir. Mar. 23, 2016), ECF No. 1605455.
In August 2016, on reconsideration of the FCC’s Order, the Commission raised the rate caps to account for a small portion of site commissions. Rates for Interstate Inmate Calling Services (“Reconsideration Order”), 31 FCC Rcd. 9300 (2016). ICS providers petitioned for review of the Reconsideration Order, but the court held those petitions in abeyance and stayed the Reconsideration Order pending the outcome of this case. See Order, Securus Techs. v. FCC, No. 16-1321 (“Securus II”) (D.C. Cir. Nov. 2, 2016), ECF No. 1644302.
On January 31, 2017, counsel for the FCC filed a letter advising this court that the Commission had experienced “significant changes in [its] composition.” Letter at 1, Global Tel*Link (D.C. Cir. Jan. 31, 2017), ECF No. 1658521. Of the five Commissioners who had voted on the Order, two of the three Commissioners in the majority had left the FCC. Id. Because the dissent’s position now commanded a ma *49 jority, counsel for the FCC informed the court that “a majority of the current Commission does not believe that the agency has the authority to cap intrastate rates under section 276 of the Act.” Id. Counsel thus advised the court that the FCC was “abandoning ... the contention ... that the Commission has the authority to cap intrastate rates” for ICS. Id. Counsel additionally informed the court that the FCC was abandoning its contention “that the Commission lawfully considered industry-wide averages in setting the rate caps.” Id. at 2. At oral argument, counsel for the Commission confirmed the agency’s abandonment of these aspects of the Order. Tr. of Oral Argument at 43-45, Global Tel*Link (D.C. Cir. Feb. 6, 2017), ECF No. 1666379.
II. ANALYSIS
A. The Posture of this Case
The current posture of this case is unusual because counsel for the FCC has advised the court that the agency will not oppose two of the principal challenges raised by Petitioners regarding: (1) the authority of the FCC to set permanent rate caps and ancillary fee caps for intrastate ICS calls; and (2) the legality of the Commission’s consideration of industry-wide averages in setting rate caps. In light of the FCC’s change of position, a question arises as to whether these challenges are moot.
It is well established that “voluntary cessation of allegedly illegal conduct does not deprive [a judicial] tribunal of power to hear and determine the case, i.e., does not make the case moot.” United States v. W.T. Grant Co., 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). As the Court explained:
A controversy may remain to be settled in such circumstances, e.g., a dispute over the legality of the challenged practices. The defendant is free to return to his old ways. This, together with a public interest in having the legality of the practices settled, militates against a mootness conclusion. For to say that the case has become moot means that the defendant is entitled to a dismissal as a matter of right. The courts have rightly refused to grant defendants such a powerful weapon against public law enforcement.
Id. at 632, 73 S.Ct. 894 (citations omitted).
“Voluntary cessation” justifies the dismissal of a case on grounds of mootness only when “the defendant can demonstrate that there is no reasonable expectation that the wrong will be repeated. The burden is a heavy one.” Id. at 633, 73 S.Ct. 894 (citation and internal quotation marks omitted); see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (“[T]he standard we have announced for determining whether a case has been mooted by the defendant’s voluntary conduct is stringent: ‘A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.’ The ‘heavy burden of persuafding]’ the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness.” (quoting United States v. Concentrated Phosphate Export Ass’n, 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968))); Payne Enters., Inc. v. United States, 837 F.2d 486, 491-92 (D.C. Cir. 1988) (same).
There is absolutely no basis for dismissing as moot the claims relating to the issues that the FCC has “abandoned.” Indeed, neither the FCC, the Petitioners, nor the Intervenors have urged this. The reason is fairly simple: the Order that gave *50 rise to the petitions for review is still in force. Although counsel for the FCC has made it clear that the agency will not defend portions of the Order, the Commission has never acted to revoke, withdraw, or suspend the Order. Given this posture of the case, it is plain that there has been no “voluntary cessation” by the FCC that would warrant dismissal of Petitioners’ challenges to the Order.
B. Standard of Review
Although Petitioners’ challenges to the provisions of the Order purporting to cap intrastate rates and to apply industry-wide averages in setting rate caps are not moot, a question remains as to what standard governs our review of these provisions. Normally, we would follow the familiar two-step Chevron framework as the appropriate standard of review. See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under the Chevron framework,
an agency’s power to regulate “is limited to the scope of the authority Congress has delegated to it.” Am. Library Ass’n v. FCC, 406 F.3d 689, 698 (D.C. Cir. 2005). Pursuant to Chevron Step One, if the intent of Congress is clear, the reviewing court must give effect to that unambiguously expressed intent. If Congress has not directly addressed the precise question at issue, the reviewing court proceeds to Chevron Step Two. Under Step Two, “[i]f Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are ... manifestly contrary to the statute.” Chevron, 467 U.S. at 843-14 [104 S.Ct. 2778]. Where a “legislative delegation to an agency on a particular question is implicit rather than explicit,” the reviewing court must uphold any “reasonable interpretation made by the administrator of [that] agency.” Id. at 844 [104 S.Ct. 2778]. But deference to an agency’s interpretation of its enabling statute “is due only when the agency acts pursuant to delegated authority.” Am. Library Ass’n, 406 F.3d at 699.
Edwards, Elliott, and Levy, Federal Standards of Review 166-67 (2d ed. 2013).
The disputed Order in this case was promulgated by the FCC “carrying the force of law.” United States v. Mead Corp., 533 U.S. 218, 226-27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). Therefore, it was presumptively subject to review pursuant to Chevron. Id. The oddity here, however, is that the agency no longer seeks deference for the parts of the Order purporting to cap intrastate rates for ICS providers and to apply industry-wide averages in setting the rate caps. In these circumstances, it would make no sense for this court to determine whether the disputed agency positions advanced in the Order warrant Chevron deference when the agency has abandoned those positions.
Although the Chevron framework is of no significance with respect to the cap on intrastate rates and the application of industry-wide averages issues, this does not affect the court’s jurisdiction to address these issues. See, e.g., New Process Steel, L.P. v. NLRB, 560 U.S. 674, 679-83, 130 S.Ct. 2635, 177 L.Ed.2d 162 (2010) (deciding the statutory issue without reference to the Chevron framework). Therefore, “[w]ith Chevron inapplicable, ... “we must decide for ourselves the best reading’ ” of the statutory provisions at issue in this case. Miller v. Clinton, 687 F.3d 1332, 1342 (D.C. Cir. 2012) (quoting Landmark Legal Found. v. IRS, 267 F.3d 1132, 1136 (D.C. Cir. 2001)).
*51 It is well recognized that when a disputed agency interpretation does not carry the force of law, it still may be “entitled to respect,” at least to the extent that the interpretation has the “power to persuade.” Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944); see also Mead, 533 U.S. at 227-31, 121 S.Ct. 2164; Christensen v. Harris Cty., 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000). However, in this case, because the FCC now offers no interpretations in support the provisions of the Order purporting to cap intrastate rates for ICS providers and apply industry-wide averages in setting the rate caps, the court must resolve these issues applying the usual rules of statutory construction. See, e.g., MCI Telecomms. Corp. v. Am. Tel. & Tel. Co., 512 U.S. 218, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994); see generally Robert A. Katzmann, Judging Statutes (2014); William N. Eskridge, Jr., Abbe R. Gluck & Victoria F. Nourse, Statutes, Regulation, and Interpretation 409-29 (2014).
With respect to the remaining issues before the court, we will apply the Chevron framework, as applicable. As to all other issues, we will apply § 706(2)(A) of the Administrative Procedure Act (“APA”), which provides that a reviewing court shall “hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.” 5 U.S.C. § 706(2)(A). Under this standard of review, we search for “reasoned decisionmaking.” Motor Vehicle Mfrs. Ass’n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co. (“State Farm”), 463 U.S. 29, 52, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). This means that we must determine whether the FCC “examine[d] the relevant data and articulatefd] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.” Id. at 43, 103 S.Ct. 2856 (internal quotation marks omitted).
C. The Authority of the FCC to Set Permanent Rate Caps and Ancillary Fee Caps for Intrastate ICS Calls
In the disputed Order, the Commission asserted authority to impose rate caps on intrastate ICS calls for the first time. It did so under the guise of § 276 of the 1996 Act, which requires the Commission to “establish a per call compensation plan to ensure that all payphone service providers are fairly compensated for each and every completed intrastate and interstate call using their payphone,” and to prescribe regulations to establish this compensation plan. 47 U.S.C. § 276(b)(1),' (b)(1)(A). Petitioners assert that the provision in § 276, requiring the Commission to ensure that ICS providers are “fairly compensated,” does not override the command of § 152(b), which forbids the FCC from asserting jurisdiction over “charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service.” 47 U.S.C. § 152(b) (emphasis added). Petitioners also contend that § 276 does not give the Commission ratemaking authority comparable to the authority that it has under § 201 to regulate and cap interstate rates. Finally, Petitioners point out that the intrastate rate caps prescribed in the Order make little sense in light of the undisputed record evidence showing that many ICS providers have costs that are higher than the disputed rate caps. We agree with Petitioners that, on the record in this case, § 276 did not authorize the Commission to impose intrastate rate caps as prescribed in the Order. Several considerations have influenced our judgment on this matter.
First, as noted above, § 152(b) of the 1934 Act erects a presumption against the Commission’s assertion of regulatory au *52 thority over intrastate communications. La. Pub. Serv. Comm’n, 476 U.S. at 373, 106 S.Ct. 1890 (making it clear that this is “not only a substantive jurisdictional limitation on the FCC’s power, but also a rule of statutory construction” in interpreting the Act’s provisions). As we explain below, the Order in this case does not come close to overcoming this presumption in proposing to cap intrastate rates.
Second, the Order erroneously treats the Commission’s authority under § 201 and § 276 as coterminous. Section 201 imbues the Commission with traditional rate-making powers over interstate calls, including the imposition of rate caps. The statute explicitly directs the FCC to ensure that interstate rates are “just and reasonable,” and to “prescribe such rules and regulations as may be necessary in the public interest” to carry out these provisions. 47 U.S.C. § 201(b). Section 276, however, does not give the Commission authority to determine “just and reasonable” rates. Rather, § 276 merely directs the Commission to “ensure that all [ICS] providers are fairly compensated” for their inter- and intrastate calls. 47 U.S.C. § 276(b)(1)(A).
The language and purpose of § 201 in the 1934 Act are fundamentally different from the language and purpose of § 276 in the 1996'Act. The Order glosses over these differences in declaring that the Commission has authority to ensure that rates are “just, reasonable and fair.” See, e.g., Order, 30 FCC Rcd. at 12766, 12817. This is not what § 201(b) and § 276 say. And once the Order misquotes the language of § 201(b) and § 276, it goes on to conclude that these provisions in their combined effect authorize the FCC to set rate caps to ensure that both inter- and intrastate rates are “ ‘just and reasonable’ and do not take unfair advantage of inmates, their families, or providers consistent with the ‘fair compensation’ mandate of section 276.” Id. at 12817. In other words, in ignoring the terms of § 276, the Order conflates two distinct statutory grants of authority into a synthetic “just, reasonable and fair” standard. This is impermissible.
Third, the Order asserts that the Commission “has previously found that the term ‘fairly compensated’ [in § 276] permits a range of compensation rates ..., but that the interests of both the payphone service providers and the parties paying the compensation must be taken into account,” implying considerations of fairness to the consumer. Id. at 12814 n.335. This assertion is unfounded. The truth is that the Commission’s prior orders align with a narrow reading of the statute that does not purport to treat the Commission’s authority under § 201 and § 276 as coterminous. The FCC’s prior orders to which the Order here refers construed the “fairly compensated” mandate of § 276 as irrelevant to ICS rates reached through contractual bargaining. This was because the FCC had determined that “whenever a [payphone provider] is able to negotiate for itself the terms of compensation for the calls its payphones originate, then [the Commission’s] statutory obligation to provide fair compensation is satisfied.” Implementation of the Pay Tel. Reclassification & Comp. Provisions of the Telecomms. Act of 1996, 11 FCC Rcd. 21233, 21269 (1996). This is hardly evidence of “just, reasonable and fair” ratemaking under § 276.
Furthermore, it is noteworthy that the Commission’s prior orders repeatedly acknowledge that § 276 focuses on the problem of uncompensated calls in situations in which BOC providers engaged in anti-competitive behavior. In other words, the FCC recognized that a principal reason for the enactment of § 276 was to address “the limitation on the ability of [payphone providers] and carriers to ne *53 gotiate a mutually agreeable amount” because of technological and regulatory constraints. Implementation of the Pay Tel. Reclassification & Comp. Provisions of the Telecomms. Act of 1996, 14 FCC Rcd. 2545, 2551, 2569 (1999). Therefore, the prior orders to which the Order at issue here refers focused on payphone providers and carriers to determine whether the providers were fairly compensated. See, e.g., id. at 2570; Implementation of Pay Tel. Reclassification & Comp. Provisions of Telecomms. Act of 1996, 17 FCC Rcd. 21274, 21302 (2002) (referring to providers and the carriers compensating the providers in stating that § 276 “implies fairness to both sides”). The prior orders did not reflect anything approaching “just, reasonable and fair” ratemaking for intrastate rates as authorized by § 201 for interstate rates.
In the agency brief that was filed with the court before the FCC abandoned its support of the intrastate rate caps, counsel argued that fairness to the consumer is implied in § 276 because the reference to “fair” (in “fairly compensated”) is “capacious.” Br. for FCC at 31. This argument finds no support in the Order. As noted above, the Order simply asserts that intrastate rate caps are consistent with the Commission’s past orders. And, as noted above, the Commission’s past orders do not support a “capacious” interpretation of “fairly compensated” in § 276 to suggest that it is comparable to “just, reasonable and fair” ratemaking in § 201. The prior orders merely relied on the “fairly compensated” language to set a default rate from which the payphone providers and carriers could negotiate a departure, not to reduce bargained-for compensation. See, e.g., 11 FCC Rcd. at 21267-69; 14 FCC Rcd. at 2569-71. The Commission made it clear that it meant to “g[i]ve primary importance to Congress’s objective of establishing a market-based, deregulatory mechanism for payphone compensation, as required both in section 276 and the generally pro-competitive goals of the 1996 Act.” 14 FCC Rcd. at 2548.
Finally, the Order cites two decisions of this court to justify an interpretation of the “fair compensation” mandate in § 276 that includes “just and reasonable” rate-making in § 201. Order, 30 FCC Rvd. at 12815-16 (citing Ill. Pub. Telecomms. Ass’n v. FCC, 117 F.3d 555, 562 (D.C. Cir. 1997); New England Pub., 334 F.3d at 75). The Order’s construction of these decisions is misguided because neither decision compels the conclusion that § 276 authorizes the Commission to cap intrastate rates pursuant to “just, reasonable and fair” ratemaking.
The Order first extracts language from the decision in Illinois saying that § 276 provides the Commission with “authority to set local coin call rates.” 117 F.3d at 562. But in the order under review in Illinois, the FCC did not “set” local coin call rates by imposing caps on intrastate rates. Rather, the agency merely interpreted the mandate of § 276(b)(1)(A) to “require[ ] the Commission to act only with respect to those types of calls for which a [payphone provider] does not already receive fair compensation.” Id. at 559 (emphasis added). And even for those calls, the FCC ultimately determined a default floor based on the deregulated market rate and allowed the payphone providers to negotiate a departure from that rate. Id. at 560.
In reviewing the FCC’s order that was contested in Illinois, we held that § 276 unambiguously overrode § 152(b)’s presumption against intrastate jurisdiction insofar as it granted the Commission authority to “set” reimbursement rates for local coin calls in order to ensure that payphone operators who were previously uncompen *54 sated were “fairly compensated.” Id. at 561-63. The court did not say that § 276 overrode the presumption against intrastate jurisdiction to allow the Commission to reduce already compensatory rates, which is what the Order at issue in this case suggests. Rather, the Illinois court said:
If locational monopolies turn out to be a problem, however, the Commission suggested some ways in which it might deal with them: a State might be permitted to require competitive bidding for locational contracts, or to mandate that additional [payphone providers] be allowed to provide payphones at the location; and if these remedies fail, the Commission may consider the matter further.
Id. at 562-63. None of these options contemplated caps on intrastate rates.
It is true that the decision in Illinois does not explicitly preclude the Commission from imposing intrastate rate caps. That was not the question before the court. But the Order at issue in this case is wrong in suggesting that the decision in Illinois reflects “significant judicial precedent [that] supports the Commission’s authority” to reduce already compensatory rates. Order, 30 FCC Rcd. at 12815. Indeed, in Illinois the court reversed the Commission’s decision to exclude certain uncompensated calls from its mandatory compensation plan because the failure to provide compensation for this type of payphone call was “patently inconsistent with § 276’s command that fair compensation be provided for ‘each and every completed ... call.’ ” 117 F.3d at 566.
The Order at issue ' in this case also purports to rely on a statement in the New England decision that § 276 “unambiguously and straightforwardly authorizes the Commission to regulate ... intrastate payphone line rates.” Order at 12815 (quoting New England Pub., 334 F.3d at 75). But here again the cited decision merely confirmed that the 1996 Act expanded the Commission’s intrastate regulatory authority within the limited parameters of § 276. The New England court held that Congress had authorized the Commission to carry out the anti-subsidy and anti-discrimination mandates of § 276(b)(1)(D)-(E) as to both inter-and intrastate payphone providers because Congress intended § 276 as a whole to “authorize the Commission to eliminate barriers to competition.” 334 F.3d at 77. But when pressed to extend § 276’s anti-subsidy and anti-discrimination mandates to non-BOC carriers, the court said, “the fact remains that sections 276(a) and 276(b)(1)(C), the sources of the Commission’s authority to regulate intrastate payphone rates, expressly apply only to the BOCs.” Id. at 78. The court was also clear in saying that outside the specific directives of § 276, general provisions “cannot ... trump section 152(b)’s specific command that no Commission regulations shall preempt state regulations unless Congress expressly so indicates. Absent authorization to apply its section 276 regulations to non-BOC [carriers], the Commission may not regulate their intrastate payphone line rates.” Id. (citation omitted).
Thus, neither Illinois nor New England stands for the proposition that the Commission has broad plenary authority to regulate and cap intrastate rates. Rather these decisions confirm the limited scope of § 276 which must be applied within the express bounds of its specific directives.
The Order’s misconstruction of our case law stems from its fundamental misreading of § 276. The Order acknowledges that the Commission’s authority over intrastate calls is, “except as otherwise provided by Congress, generally limited by section [152(b) ] of the Act.” Order, 30 FCC Rcd. at 12814. The Commission thus recognized *55 that to assert jurisdiction over intrastate rates, the 1996 Act must “unambiguously appl[y] to intrastate services.” Id. The Order errs, however, in concluding that § 276 required it “to broadly craft regulations to ‘promote the widespread development of payphone services for the benefit of the general public,’ ” and that this constituted a “general grant of jurisdiction.” Id. (quoting 47 U.S.C. § 276(b)(1)). This misreads the language of § 276. The statute merely commands the Commission, “[i]n order to promote competition among payphone service providers and promote the widespread deployment of payphone services to the benefit of the general public,” 47 U.S.C. § 276(b)(1), to prescribe regulations to accomplish “five specific steps toward that goal,” New England Pub., 334 F.3d at 71. This is not a “general grant of jurisdiction” over intrastate ratemaking.
The Order at issue in this case is legally infirm because it purports to cap intrastate rates based on a “just, reasonable and fair” test that is not enunciated in the statute, conflates distinct grants of authority under § 201 and § 276, and misreads our judicial precedent and the FCC’s own prior orders to support capping already compensatory rates under the guise of ensuring providers are “fairly compensated.” The point here is straightforward:
The FCC’s belief that lower ICS calling rates reflect desirable social policy cannot justify regulations that exceed its statutory mandate. Section 276 of the Communications Act authorizes the FCC to ensure that ICS providers are not deprived of fair compensation for the use of their payphones; § 201 authorizes it to ensure that rates for and in connection with interstate telecommunications services are just and reasonable. The FCC may not ignore these statutory limits to advance its preferred correctional policy.
Joint Br. for Pet’rs at 4.
We therefore reverse and vacate the provision in the Order that purports to cap intrastate rates as beyond the statutory authority of the Commission. We need not decide the precise parameters of the Commission’s authority under § 276. We simply hold here that the agency’s attempted exercise of authority in the disputed Order cannot stand.
D. The Categorical Exclusion of Site Commission Costs
The Petitioners contend that:
The FCC’s exclusion of site commission payments from the costs used to set ICS rate caps was unlawful. ICS providers are required by state and local governments and correctional institutions to pay site commissions; those commissions are accordingly a cost of providing service like other state taxes and fees that the FCC recognizes as recoverable costs. The FCC acknowledged that, taking site commissions into consideration, the rate caps were below providers’ costs. This violates the FCC’s obligation to “ensure that all payphone service providers are fairly compensated,” 47 U.S.C. § 276(b)(1)(A), § 201’s “just and reasonable” requirement, and the Constitution’s Takings Clause.
Joint Br. for Pet’rs at 16. The concerns raised by Petitioners are compelling.
The Commission’s categorical exclusion of site commissions from the calculus used to set ICS rate caps defies reasoned decisionmaking because site commissions obviously are costs of doing business incurred by ICS providers. Yet, the Order categorically excluded site commissions and then “set the rate caps below cost.” Id. at 20. This is hard to fathom. “An agency acts arbitrarily or ca *56 priciously if it has ... offered an explanation either contrary to the evidence before the agency or so implausible as not to reflect either a difference in view or agency expertise.” Defs. of Wildlife & Ctr. for Biological Diversity v. Jewell, 815 F.3d 1, 9 (D.C. Cir. 2016) (citing State Farm, 463 U.S. at 43, 103 S.Ct. 2856). Ignoring costs that the Commission acknowledges to be legitimate is implausible.
The FCC’s suggestion that site commissions “have nothing to do with the provision of ICS,” Order, 30 FCC Rcd. at 12822 (internal quotation marks omitted), makes no sense in light of the undisputed record in this case. In some instances, commissions are mandated by state statute, Rates for Interstate Inmate Calling Services, 27 FCC Rcd. 16629, 16643 (2012), and in other instances commissions are required by state correctional institutions as a condition of doing business with ICS providers, 17 FCC Rcd. at 3252-53. “If agreeing to pay site commissions is a condition precedent to ICS providers offering their services, those commissions are ‘related to the provision of ICS.’ ” Joint Br. for Pet’rs at 21. And it does not matter that the states may use the commissions for purposes unrelated to the activities of correctional facilities. The ICS providers who are required to pay the site commissions as a condition of doing business have no control over the funds once they are paid. None of the other reasons offered by the Commission to justify the categorical exclusion of site commissions passes muster.
On the record before us, we simply cannot comprehend the agency’s reasoning. Where, as here, an agency’s “explanation for its determination ... lacks any coherence,” we owe “no deference to [the agency’s] purported expertise.” Tripoli Rocketry Ass’n v. Bureau of Alcohol, Tobacco, Firearms, and Explosives, 437 F.3d 75, 77 (D.C. Cir. 2006); see also Coburn v. McHugh, 679 F.3d 924 (D.C. Cir. 2012). Not only does the FCC’s reasoning defy comprehension, the categorical exclusion of site commissions cannot be easily squared with the requirements of § 276 and § 201. We therefore vacate this portion of the Order.
In its 2016 Reconsideration Order, the Commission raised the rate caps specifically to account for a portion of site commissions, effectively acknowledging that a categorical exclusion of site commissions from the ratemaking calculus is implausible. The Commission said:
[W]e have decided, out of an abundance of caution, to take a more conservative approach and expressly account for facilities’ ICS-related costs when calculating our rate caps. Accordingly, we grant the Hamden Petition in part ... and increase our interstate and intrastate rate caps to expressly account for reasonable facility costs related to ICS.
Reconsideration Order, 31 FCC Rcd. at 9302. Although the FCC purported to change its position in the Reconsideration Order, that order does not moot Petitioner’s challenge here. See, e.g., N.E. Fla. Contractors v. Jacksonville, 508 U.S. 656, 662, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993) (replacing the challenged law “with one that differs only in some insignificant respect” and “disadvantages [petitioners] in the same fundamental way” does not moot the underlying challenge).
The Reconsideration Order is not before us, so we cannot say whether it provides a satisfactory response to Petitioners’ challenge. We will leave this for the Commission’s consideration on remand. We also leave it to the Commission to assess on remand which portions of site commissions might be directly related to the provision of ICS and therefore legitimate, and which are not. *57 In addition, although we conclude that the Order at issue here is arbitrary and capricious insofar as it categorically excludes site commissions from the rate-making calculus, we do not reach Petitioners’ remaining arguments that the exclusion of site commissions denies ICS providers fair compensation under § 276 and violates the Takings Clause of the Constitution because it forces providers to provide services below cost. These matters should be addressed by the Commission on remand once it revisits the exclusion of site commissions from the ratemaking calculus.
E. The Legality of the FCC’s Use of Industry-Wide Averages in Setting Rate Caps
Petitioners contend that:
Even if site commissions are disregarded, the rate caps were set too low to ensure compensation “for each and every completed ... call.” [47 U.S.C. § 276(b)(1)(A) ]. The FCC’s caps are below average costs documented by numerous ICS providers and would deny cost recovery for a substantial percentage of all inmate calls. The FCC’s assertion that ICS providers with costs above the caps operate inefficiently is contrary to the record. The FCC relied on two outlier ICS providers that — combined— represent 0.1 percent of the ICS market. And it ignored evidence showing that the cost to provide ICS varies widely on the basis of regional differences, such as the age and condition of a given facility or the specific security features that correctional authorities demand.
[[Image here]]
The record includes two economic analy-ses, both concluding that the Order’s rate caps are below cost for a substantial number of ICS calls even after excluding site commissions....
The Order does not challenge these studies or their conclusions. On the contrary, it acknowledges that seven of 14 ICS providers that submitted cost data reported per-minute costs of “$0.25 or higher,” above the highest prepaid rate cap of $0.22 per minute.
Joint Br. for Pet’rs at 16-17, 30-31 (quoting Order, 30 FCC Rcd. at 12769-70, 12795). Petitioners’ claims are well taken and largely undisputed. And, as noted above, the FCC has abandoned its contention that the agency lawfully considered industry-wide averages in setting the rate caps, and for good reasons.
First, to the extent that the Order purports to set caps for intrastate rates, it is infirm for the reasons stated above. Second, the averaging calculus is patently unreasonable. The FCC calculated its rate caps “using a weighted average per minute cost,” Order, 30 FCC Rcd. at 12790, allowing providers to “recover average costs at each and every tier,” id. n.170. This makes calls with above-average costs in each tier unprofitable, however, and thus does not fulfill the mandate of § 276 that “each and every” inter- and intrastate call be fairly compensated. See Am. Pub. Commc’ns Council v. FCC, 215 F.3d 51, 54, 57-58 (D.C. Cir. 2000).
Moreover, the Order advances an efficiency argument' — that the larger providers can become profitable under the rate caps if they operate more efficiently— based on data from the two smallest firms. See Order, 30 FCC Rcd. at 12790-95. Not only do those firms represent less than one percent of the industry, but the record shows that regional variation, not efficiency, accounts for cost discrepancies among providers. See id. at 12965 n.61 (dissenting statement of Commissioner Pai). The Order does not account for these conflicting record data.
*58 In sum, the Order’s analysis of the record data in setting rate caps was not the product of reasoned decisionmaking. We will therefore vacate that portion of the Order and remand for further proceedings.
F. The Imposition of Ancillary Fee Caps
Contrary to Petitioners’ contentions, the Order’s imposition of ancillary fee caps in connection with interstate calls is justified. The Commission has plenary authority to regulate interstate rates under § 201(b), including “practices ... for and in connection with” interstate calls. The Order explains that ICS providers use ancillary fees as a loophole in avoiding per-minute rate caps. Order, 30 FCC Rcd. at 12842. Furthermore, ancillary fees for interstate calls satisfy the test of the Commission’s authority under § 201(b) as they are “in connection with” interstate calls. However, these considerations do not fully answer the question whether the disputed imposition of ancillary fee caps is permissible.
As noted above, we have found that, on the record in this case, the Order’s imposition of intrastate rate caps fails review under § 276. Therefore, we likewise hold that the FCC had no authority to impose ancillary fee caps with respect to intrastate calls. However, we cannot discern from the record whether ancillary fees can be segregated between interstate and intrastate calls. We are therefore obliged to remand the matter to the FCC for further consideration.
G. The Imposition of Reporting Requirements
The Commission initially contended that the Order’s requirements with respect to reporting requirements for video visitation services and site commissions were unripe for review because they were pending budgetary approval by the Office of Management and Budget (“OMB”). After briefing, however, OMB approval was published. See 82 Fed. Reg. 12182-01 (Mar. 1, 2017). Accordingly, the Commission withdrew its ripeness challenge. Letter, Global Tel*Link (D.C. Cir. Mar. 1, 2017), ECF No. 1663705. Therefore, the parties agree that we may review the Commission’s imposition of the disputed reporting requirements.
We hold that the video visitation services reporting requirement, 47 C.F.R. § 64.6060(a)(4), is too attenuated to the Commission’s statutory authority to justify this requirement. The Commission asserts that whether or not video visitation services are a form of ICS, they are still subject to the agency’s jurisdiction. See, e.g., Order, 30 FCC Rcd. at 12891-92; Br. for FCC at 56-57. We disagree. Before it may assert its jurisdiction to impose such a reporting requirement, the Commission must first explain how its statutory authority extends to video visitation services as a “eommunieation[ ] by wire or radio” under § 201(b) for interstate calls or as an “inmate telephone service” under § 276(d) for interstate or intrastate calls. The Order under review offers no such explanations. We therefore vacate the reporting requirement for video visitation services.
In contrast, we find no merit in Petitioners’ challenge to the site commission payment reporting requirement under 47 C.F.R. § 64.6060(a)(3). The quibble between the parties is largely over semantics. The Commission agrees that the definition of site commission payment should be read largely as Petitioners argue: namely, site commissions are “incentive payments designed to influence a correctional authority’s selection of its monopoly service provider, not a form of ordinary tax.” Br. for FCC at 59 (citing Order, 30 FCC Rcd. at 12818-22). So defined, the *59 reporting requirement is lawful on its face and Petitioners do not disagree. We therefore deny the petition for review.
H. The Preemption and Due Process Claims
Petitioner Pay Tel separately challenges the Commission’s refusal to preempt certain state ICS rate caps that are lower than those the Commission set in the Order. Because we are vacating the portion of the Order imposing intrastate rate caps under § 276(b), the preemption provision under § 276(c) is no longer at issue. There are no relevant regulations under § 276 remaining in the Order with respect to which the lower state rate caps might be preempted. This issue is therefore moot.
Pay Tel’s claim that its due process rights were infringed when it was not given timely access to key cost data that the FCC relied on in setting the rate caps is also moot. We are vacating the portion of the Order setting rate caps for intrastate rates; the Commission has acknowledged that its use of industry-average data to set rates was error; and Pay Tel obtained access to the disputed data prior to the Commission’s issuance of the Reconsideration Order setting rate caps that supersede those in the Order at issue. The concerns raised by Pay Tel are thus moot.
III. CONCLUSION
In accordance with the foregoing opinion, we grant in part and deny in part the petitions for review, vacate certain provisions in the disputed Order, and remand for further proceedings with respect to certain matters. We also dismiss two claims as moot.

So ordered.